UNITED STATES of America,
Plaintiff–Appellant,

v.

James Joshua THOMPSON, aka James Deas, Defendant–Appellee.

No. 00–30382.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 9, 2001.

Filed March 4, 2002.

---

Sangita K. Rao, Department of Justice, Criminal Appellate Section, Washington, DC, for the plaintiff-appellant.

Robert M. Leen, Seattle, WA, for the defendant-appellee.

Before: B. FLETCHER, McKEOWN, and TALLMAN, Circuit Judges.

## OPINION

TALLMAN, Circuit Judge.

The United States appeals the district court's order suppressing drug evidence seized by the Coast Guard from a vessel off the coast of Washington State. James Joshua Thompson, the skipper of the boat, was charged with one count of conspiring to distribute 50 kilograms or more of marijuana under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846, and one count of possession of marijuana with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), and 18 U.S.C. § 2. We have jurisdiction under 28 U.S.C. § 1291. We reverse the district court's suppression order and remand for further proceedings.

### I

On August 30, 2000, shortly after 8:00 p.m.,[1] a Coast Guard 27 foot patrol boat

---

1. The district court found that the encounter occurred at "approximately 8:20 p.m.". The record on appeal indicates, however, that the IKEA was boarded at approximately 8:09

encountered and stopped the M/V IKEA, a 19–to–22–foot pleasure craft, near the San Juan Islands.[2] The IKEA was traveling southbound when the Coast Guard intercepted it. Thompson was operating the IKEA, and Kanwanjit Bassi was the only other person on board. Coast Guard Boatswain's Mate Terry Reed and Petty Officer Bruce Karakashian boarded the vessel to conduct a safety inspection.

During the inspection, Reed asked Thompson for the boat's registration. Thompson was unable to provide it. He pointed to the inside window of the boat and stated that the registration had been taped there and may have blown off. Although it appeared that something had been taped to the window, Reed later testified that he found Thompson's explanation suspicious because in his six years' experience with the Coast Guard, he had never encountered a vessel with its registration taped to the window where it would be exposed to the weather and could get wet or lost.

Reed observed a sticker on the front of the boat which indicated it had previously been registered in Idaho, but that the registration had expired. When Reed asked Thompson to identify the vessel's registered owner, Thompson responded, "a friend," but could not provide the friend's name. He also claimed that the IKEA had traveled from the south and was on the return leg of the voyage. Despite this explanation, the officers' suspicions were

aroused because they had found the boat heading south on a known smuggling route between Canada and the United States.

As part of the safety inspection, the boarding officers checked that the IKEA's life jackets, fire extinguisher, horn, and life ring were aboard and operational, the boat was not leaking fuel or taking on water, and the bilges were clear of oil or gasoline vapors.

When asked to produce a life jacket for each person on board, Thompson entered the vessel's cabin to retrieve them and exposed the vessel's interior to the officers' view. Reed observed in plain view at least one large hockey-style duffel bag lying in the cabin. At some point during the encounter, a second duffel bag was observed by the officers. From personal experience, recent drug seizures, the accounts of their colleagues, field intelligence reports, and a recent training program on local narcotics trafficking *modus operandi*, the officers knew that similar duffel bags commonly were being used to smuggle marijuana into the United States from Canada.

At Reed's request, Thompson and Bassi each provided their name and date of birth, but Thompson refused to provide his Social Security number. Reed also asked them to produce some form of identification. At approximately 8:20 p.m., halfway through the safety inspection, Reed initiated a warrants and criminal history records check on the two men.[3] Reed testi-

---

p.m. and that the boarding party requested a records and warrants check at 8:20 p.m.

**2.** The San Juan Islands are located in the northwest portion of Washington State, adjoining Canadian waters. At the time, the IKEA was in "customs waters," or within 12 miles of the U.S. coast, an area patrolled by the Coast Guard. *United States v. Dobson,* 781 F.2d 1374, 1377 n. 3 (9th Cir.1986).

**3.** Although the computer check initiated by Reed is referred to as a "warrants search"

throughout the district court proceedings, it appears that the inquiry also included a "criminal history records check" because information gleaned from the inquiry included data beyond a typical warrants search (e.g., Thompson's alleged affiliation with the Canadian Hell's Angels motorcycle gang, a group known to engage in drug trafficking). Thus, where the term "warrants search" is used in this opinion, it refers to the entire computer inquiry conducted in this case, which included a criminal history check and a search of

fied that it was his practice to request a law enforcement computer records search as part of a vessel safety inspection. He continued the inspection while awaiting the results of the computer check.[4]

When asked about the purpose of his trip, Thompson responded that he and Bassi had replaced the vessel's battery and repaired the throttle, and were taking the vessel out for a test cruise. The boarding party observed that both Thompson and Bassi were cleanly dressed with no visible grease or dirt on them, and that there were a number of tools strewn across the deck of the IKEA, but most looked new and unused. In particular, a closed Craftsman 100 piece tool box still bore the manufacturer's decal that identifies the contents of the tool box.

The officers completed their safety inspection in approximately 15 minutes. Except for the missing vessel registration, there were no other violations observed. The officers continued to detain the vessel, however, to await the results of the warrants check. The computer check involved passing the passengers' identification information to the Coast Guard boat tied alongside the IKEA, which then radioed the information to the station in Bellingham, which in turn called the Border Patrol office in Blaine, Washington, to actually run the records search. The response was relayed back and indicated that Thompson had a prior drug smuggling conviction, used an alias of James Joshua Deas, and was affiliated with the Hell's Angels motorcycle gang in Canada.

Believing they then had sufficient evidence establishing probable cause to conduct a search of the duffel bags, the officers detained the vessel another 30 minutes while awaiting administrative authorization from their shore-based superiors (including Coast Guard legal officers). Permission was obtained and the subsequent search revealed over 100 pounds of marijuana. Thompson and Bassi were arrested and taken to port.[5]

The district court conducted a lengthy evidentiary hearing on Thompson's motion to suppress the marijuana, and then made oral findings of fact on the record. In a subsequent order, the district court granted the motion to suppress on the ground that the continued detention of the M/V IKEA after the completion of the safety inspection and before the results of the computer check were known, constituted a seizure of the vessel and crew without probable cause.

## II

■■■ Whether the continued detention of the IKEA after completion of the safety inspection was permissible as an investigatory detention based on reasonable suspicion or whether it constituted a seizure and arrest requiring probable cause is a question we review de novo. *United States v. Michael R.*, 90 F.3d 340, 345 (9th Cir.1996). We review the district court's factual findings for clear error. *United States v. Gonzalez–Rincon*, 36 F.3d 859, 863 (9th Cir.1994).

automated indices to locate any outstanding arrest warrants for either man.

4. While the record is unclear regarding which aspects of the safety inspection had been completed at the time the warrants check was initiated, the Coast Guard officer who radioed the Coast Guard Station at Bellingham to request the warrants check told the shore-based watchstander that the boarding party had already observed two suspicious hockey bags aboard the IKEA. This is confirmed by the testimony of both the officer on board who radioed the message and the shore-based watchstander who received it.

5. Prior to the suppression hearing, Bassi pled guilty pursuant to a plea agreement.

The Coast Guard has broad authority to board and search vessels in and near United States waters. Under 14 U.S.C. § 89(a) Coast Guard officers may "make inquiries, examinations, inspections, searches, seizures and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." *See also* 19 U.S.C. § 1581(a) (2001) (stating that Customs officers "may at any time go on board of any vessel . . . within the customs waters . . . and examine the manifest and other documents and papers and examine, inspect, and search the vessel . . .") Thus, the initial detention and boarding of the IKEA for purposes of a suspicionless safety inspection was lawful under the Coast Guard's broad statutory mandate and is not at issue in this case. Thompson does not challenge the initial boarding.

 The district court found that once the results of the warrants check became known to the Coast Guard officers, and they knew that Thompson had a prior drug smuggling conviction and used an alias, there was probable cause to detain, search the vessel, and arrest him. Thompson does not challenge this finding on appeal. Therefore, it remains only for us to decide the legality of the 15–20 minute delay between the end of the safety inspection and the officers' receipt of the results of the warrants check. As to this period of time, the district court ruled that the Coast Guard's actions "constituted a seizure without probable cause." We disagree.

"[R]estrictions on a person's freedom of movement may be imposed to maintain the status quo while making an initial inquiry provided the force displayed is not excessive under the circumstances." *United States v. Maybusher,* 735 F.2d 366, 372 (9th Cir.1984) (upholding search and seizure of vessel). The restrictions imposed on Thompson during the 15–20–minute delay include the fact that the Coast Guard vessel was tied to the IKEA, Thompson was not told that he was free to leave after the completion of the safety inspection, and the officers remained on board the IKEA until they received the results of the records check.

 In determining whether an arrest has occurred, "a court must evaluate all the surrounding circumstances, including the extent to which liberty of movement is curtailed and type of force or authority employed."[6] *United States v. Torres–Sanchez,* 83 F.3d 1123, 1127 (9th Cir.1996) (internal quotations omitted). *Torres–Sanchez* involved an individual who, during a 29–minute investigative stop, spent 20 minutes being questioned by a police officer in the officer's patrol car and who was never told by the officer that he was free to leave. We ruled that the detention was not an arrest, concluding instead that "[t]he critical inquiry is whether the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 1129(internal quotations omitted).

Similarly, the delay caused by the computer check on the IKEA's crew did not transform the detention into an arrest. In attempting to confirm or dispel their suspicions of criminal activity, the Coast Guard officers used no threats of force or coercive tactics, and the 15–20–minute delay

---

**6.** Thompson concedes in his brief that the district court should have applied the reasonable suspicion standard instead of the probable cause standard in evaluating the detention

of the IKEA while awaiting the result of the warrants check. *See generally Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

was neither lengthy nor unnecessary. *See United States v. Troise*, 796 F.2d 310, 313 (9th Cir.1986)(detention of vessel for 2.5 hours not an improper seizure where Coast Guard detained defendants no longer than necessary to complete inspection). The information pertaining to the warrants check was conveyed promptly back and forth among all the parties (from the IKEA to the Coast Guard patrol boat, to the Coast Guard station in Bellingham, to the Border Patrol, and back), a practice necessitated by the fact that the encounter took place on the water and the Coast Guard apparently did not have the ability to conduct computerized warrant checks directly from their patrol boat while at sea. Had the encounter taken place on land in the context of a routine traffic stop, a police officer would have run the same warrants check in a matter of minutes without violating *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that a police officer may engage in limited detention and search of a suspect short of arrest, where reasonable suspicion of criminal activity and possible threat to officer safety exist).

The United States has a strong interest in protecting its borders and regulating the activities of maritime traffic, an interest first recognized by Congress early in the history of the Republic when it granted Coast Guard revenue cutters the authority to conduct suspicionless boardings; authority which has been repeatedly upheld by courts. *See, e.g., United States v. Villamonte–Marquez*, 462 U.S. 579, 592, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); *United States v. Watson*, 678 F.2d 765, 771–74 (9th Cir.1982). In light of the totality of these circumstances, the 15 to 20 minute wait for the results of the warrants check amounted to a permissible investigatory detention which need only be based on the officers' reasonable suspicion that

criminal activity may be afoot. *Terry*, 392 U.S. at 30, 88 S.Ct. 1868.

### III

■ Whether the Coast Guard officers had reasonable suspicion to detain Thompson pending results of the warrants check is a question we review de novo. *Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Reasonable suspicion "is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Rojas–Millan*, 234 F.3d 464, 468–69 (9th Cir.2000) (internal quotation marks and citations omitted).

■ Based on the factual findings made by the district court, the Coast Guard officers had reasonable suspicion to further detain Thompson pending receipt of the results of the warrants check. Thompson was unable to supply the vessel's registration, he could not recall the name of the vessel's owner, and the vessel sported an expired Idaho registration sticker. These facts alone supported a reasonable suspicion that the vessel might be stolen.

Also of consequence, though arguably less persuasive, are the facts that (1) Thompson's story about taking a newly-repaired boat on a "test run" appeared contrived because his clothes were unsoiled, the nearest boat launch was 12 miles away, and the tools lying on deck appeared unused; and (2) the officers knew that duffel bags were often used to smuggle drugs in the Pacific Northwest. These facts are relatively innocuous because they may be consistent with innocent behavior. By themselves they do not support a finding of reasonable suspicion, but when viewed along with the other facts in this case they add at least marginally to

the suspicion that criminal activity may have been afoot.

The location of the boat added to the suspicion. When the Coast Guard interdicted the IKEA, she was traveling southbound along a route frequented by international drug smugglers between Canada and the United States. When questioned, Thompson related that the IKEA had originally come from the south. The officers' own observations belied this statement and, in light of all the other facts known to the officers, established reasonable suspicion to detain the IKEA pending the results of the warrants check.

Finally, the scope of the 15–20–minute detention caused by the warrants check did not exceed the permissible limits of an investigative detention under the circumstances. A check for warrants and criminal history is a minimally-intrusive inquiry. The short delay was reasonable because the stop occurred off-shore, and information had to be relayed among multiple parties. Despite these practical considerations, the warrants check was completed in a timely fashion. In light of the mobility of the vessel and the proximity to the international border, an additional 15–20–minute delay was incidental when compared to the Government's interest in "the prevention, detection, and suppression of violations of laws of the United States." 14 U.S.C. § 89(a) (2001). For Fourth Amendment purposes, this detention was minimally intrusive until reasonable suspicion ripened into probable cause for the search and arrest of the smugglers.

The district court's order granting Thompson's motion to suppress is RE-VERSED, and this case is REMANDED for further proceedings.

Opinion by Judge TALLMAN.