2005 UT 26

**STATE of Utah, Plaintiff and Petitioner,**

v.

**David Roger MARKLAND, Defendant and Respondent.**

No. 20040190.

Supreme Court of Utah.

April 15, 2005.

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., Michaela Andruzzi, Salt Lake City, for plaintiff.

Linda M. Jones, Nisa J. Sisneros, Salt Lake City, for defendant.

DURRANT, Justice:

¶ 1 In this case, we must determine whether David Roger Markland's constitutional right to be free from unreasonable searches and seizures was violated when a police officer detained him in order to run a five-minute warrants check. At issue is whether Markland's detention was justified by a reasonable suspicion that Markland had engaged, was engaged, or was about to engage in criminal activity. The district court concluded that Markland's detention was justified. However, in a 2–1 opinion, the Utah Court of Appeals reversed, holding that the detention was unlawful because the facts in the record did not support the conclusion that the detaining officer possessed the requisite degree of suspicion prior to initiating the detention. We granted certiorari to review the court of appeals' decision. We now reverse.

## BACKGROUND

¶ 2 At 3:14 a.m., Deputy Edward Spotten received a call from dispatch informing him that someone was "screaming or crying out for help" near the eastern end of the Bridgeside Landing apartment complex. Deputy Spotten arrived at the apartment complex within five minutes after hearing the report. Upon his arrival, Deputy Spotten proceeded to drive down a dead end street located on the east side of the complex. At that time, he observed Markland walking toward the dead end of the poorly lit street. Markland was carrying two over-the-shoulder cloth bags and was the only individual Deputy Spotten noticed in the area.

¶ 3 Deputy Spotten pulled his patrol car alongside Markland, exited the vehicle and, after informing Markland that there had been a report of screaming in the area, asked whether Markland had heard anything. Markland responded in the negative. Deputy Spotten then asked Markland where he was headed. Markland replied that he was walking home, which he stated was approximately twenty blocks away. Aware that the

street on which Markland was traveling reached only a dead end, Deputy Spotten reasoned that Markland's present course would not lead him home.

¶ 4 At that point, Deputy Spotten asked Markland for some identification and proceeded to run a brief warrants check. That check revealed an outstanding warrant for Markland's arrest. Deputy Spotten therefore arrested Markland and, in a search incident to that arrest, discovered drug paraphernalia, methamphetamine, and marijuana.

¶ 5 The State charged Markland with two counts of unlawful possession of a controlled substance. Markland, arguing that his detention during the warrants check was unlawful, moved to suppress the drugs discovered after his arrest. After a hearing, the district court denied the motion to suppress, and Markland appealed.

¶ 6 In a 2–1 decision, the court of appeals reversed the district court's ruling and held that Deputy Spotten's detention of Markland for the purpose of running a warrants check was not supported by a reasonable suspicion that Markland was connected to criminal activity. *State v. Markland*, 2004 UT App 1, ¶ 9, 84 P.3d 240. The State petitioned this court for a writ of certiorari, which we granted. We have jurisdiction pursuant to Utah Code section 78–2–2(5) (2002).

## STANDARD OF REVIEW

■■■ ¶ 7 "On certiorari, we review the decision of the court of appeals and not that of the district court." *State v. Brake*, 2004 UT 95, ¶ 11, 103 P.3d 699. Our review is for correctness, and we grant no deference to the court of appeals' opinion. *Grand County v. Rogers*, 2002 UT 25, ¶ 6, 44 P.3d 734. As an essential component of this correctness review, we must determine whether the court of appeals applied the proper standard of review when considering the district court's

ruling. *Brake*, 2004 UT 95 at ¶ 11, 103 P.3d 699.

¶ 8 In the present case, the court of appeals reviewed the district court's ruling for correctness, but it conducted that review "with a measure of discretion given to the trial judge's application of the legal standard to the facts." *State v. Markland*, 2004 UT App 1, ¶ 2, 84 P.3d 240 (internal quotation omitted). Subsequent to the court of appeals' decision in *Markland*, we released our opinion in *Brake*, which resolved apparent confusion as to the appropriate standard of review in the search and seizure context and expressly adopted non-deferential review in such cases. *Brake*, 2004 UT 95 at ¶ 15, 103 P.3d 699 ("We abandon the standard which extended 'some deference' to the application of law to the underlying factual findings in search and seizure cases in favor of non-deferential review.").

¶ 9 As *Brake* makes clear, the court of appeals improperly granted deference to the district court's application of the law to the facts. Consequently, when undertaking our own review, we apply the proper, non-deferential standard.

## ANALYSIS

■■■ ¶ 10 The Fourth Amendment's protections against unreasonable searches and seizures "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). However, it is settled law that "a police officer may detain and question an individual when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *State v. Chapman*, 921 P.2d 446, 450 (Utah 1996) (internal quotation omitted).[1] In order to justify such a detention, the

---

1. Our case law has identified three permissible levels of police stops:

> (1) An officer may approach a citizen at any time and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an articulable suspicion that the person has committed or is about to commit a crime ...; (3) an officer may arrest a suspect if the officer has

probable cause to believe an offense had been committed or is being committed.

*State v. Johnson*, 805 P.2d 761, 763 (Utah 1991) (internal quotation and quotation marks omitted). In the present case, the parties agree that a level-two stop commenced when Deputy Spotten requested Markland's identification for the purpose of conducting a warrants check.

officer's suspicion must be supported by "specific and articulable facts and rational inferences," *United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir.1990), and cannot be merely an "inchoate and unparticularized suspicion or 'hunch,' " *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277, 122 S.Ct. 744. Indeed, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274, 122 S.Ct. 744.

■ ¶ 11 When reviewing a given factual situation to determine if reasonable suspicion justified a detention, "[c]ourts must view the articulable facts in their totality and avoid the temptation to divide the facts and evaluate them in isolation." *State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590. Courts must also "judge the officer's conduct in light of common sense and ordinary human experience and . . . accord deference to an officer's ability to distinguish between innocent and suspicious actions." *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir.2001) (internal quotation and citations omitted); *accord Warren*, 2003 UT 36 at ¶¶ 20–21, 78 P.3d 590 (stating that courts should consider officers' subjective assessment of the facts).

¶ 12 The parties to this appeal do not dispute the articulation of the law outlined above, nor do they dispute the relevant facts. Rather, they dispute whether the facts observed by Deputy Spotten gave rise to a reasonable, articulable suspicion that criminal activity was afoot and that Markland was connected to that activity.

¶ 13 The district court concluded that Deputy Spotten did have a reasonable, articulable suspicion and, in support of that conclusion, found the following facts:

a) [Deputy Spotten] received a report that someone was crying for help five minutes earlier in the area where he found [Markland].

b) It was late at night and the area was not well lit.

c) [Markland] was headed down a dead-end road where he could not get anywhere.

d) [Markland] said he was going home to a location that he could not get to by traveling in the direction in which he was headed.

e) [Markland] was carrying two bags with him.

¶ 14 The court of appeals reversed the district court's ruling, stating that the facts, as found by the district court, were not constitutionally sufficient to justify Markland's detention because "Deputy Spotten did not testify that he had any suspicions of criminal activity concerning [Markland]." *State v. Markland*, 2004 UT App 1, ¶ 7, 84 P.3d 240. According to the court of appeals, "the officers responded to a suspicious circumstances call, yet they did not observe, have knowledge of, or have suspicions about any crime that had been committed or was about to be committed, let alone any crime [Markland] had committed or was about to commit." *Id.* at ¶ 8. The court of appeals further noted that the facts observed by Deputy Spotten "were at least as consistent with lawful behavior as with the commission of a crime." *Id.* at ¶ 7 (internal quotation omitted).

¶ 15 The State argues that the court of appeals misapplied previous case law in concluding that the detention was unconstitutional. Markland disagrees, contending that the court of appeals conducted the appropriate analysis. Markland further argues that, even if we conclude that reasonable suspicion did justify his detention, we can nevertheless affirm the court of appeals by holding that the warrants check exceeded the permissible scope of the detention. We will analyze each contention in turn.

## I. MARKLAND'S DETENTION WAS JUSTIFIED BY REASONABLE SUSPICION

■ ¶ 16 Although we consider this a close case, we conclude that Deputy Spotten's detention of Markland was justified by a reasonable, articulable suspicion that crime was afoot and that Markland was connected to that crime. The court of appeals, in reaching the opposite conclusion, unduly emphasized

the possibility of an innocent explanation of the facts Deputy Spotten witnessed, and followed an overly formalistic approach to the type of testimony that an officer must supply in detention cases.

¶ 17 As to the first point, it is settled law that an officer is not obligated to rule out innocent conduct prior to initiating an investigatory detention. *United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). This is because the public interest in investigating criminal activity is sufficiently important to justify the minimal intrusion into personal security that such investigatory detentions entail. *Arvizu*, 534 U.S. at 273, 122 S.Ct. 744.

¶ 18 In its opinion, the court of appeals stated that " 'the facts known to the officers regarding [the defendant] were at least as consistent with lawful behavior as with the commission of a crime.' " *State v. Markland*, 2004 UT App 1, ¶ 7, 84 P.3d 240 (quoting *Salt Lake City v. Ray*, 2000 UT App 55, ¶ 19, 998 P.2d 274). This language improperly imposes something akin to a preponderance of the evidence standard that officers must satisfy before initiating an investigatory detention. The United States Supreme Court has made it clear that such a standard is inappropriate in the investigatory detention context. *See Arvizu*, 534 U.S. at 274, 122 S.Ct. 744 ("[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."). As a result, the court of appeals placed an improperly elevated burden on the State. That elevated burden, in turn, contributed to the court's incorrect conclusion that Markland's detention was unconstitutional.

■ ¶ 19 Additionally, the court of appeals put too great an emphasis on the fact that Deputy Spotten never testified as to what crime he suspected had been committed or how Markland was connected to that crime. In a sense, the court of appeals faults Deputy Spotten for not connecting his own testimonial dots. However, the Fourth Amendment does not demand such rigid formalities. As long as the underlying facts,

and reasonable inferences drawn from those facts, justify the conclusion that reasonable suspicion existed at the inception of a level-two stop, the Fourth Amendment is satisfied. *See United States v. Werking*, 915 F.2d 1404, 1407 (10th Cir.1990) (stating that an investigatory detention "is justified when specific and articulable facts *and rational inferences drawn from those facts* give rise to a reasonable suspicion" that crime is afoot (emphasis added)); *see also State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590 (stating that an officer "must be able to point to specific facts which, *considered with rational inferences from those facts*, reasonably warrant the intrusion" (emphasis added)). Although the connections that the court of appeals deems necessary may be absent from Deputy Spotten's express testimony, those connections can reasonably and rationally be inferred from the totality of facts to which Deputy Spotten testified.

¶ 20 Deputy Spotten's testimony established that he arrived at the Bridgeside Landing apartment complex just after 3:00 a.m., only a few minutes after hearing a report that someone was "screaming or crying out for help" in the area. Upon his arrival, he observed only one individual, a man carrying two over-the-shoulder cloth bags, who was walking toward the dead end of a poorly lit street. At that point, reason demanded that Deputy Spotten initiate contact with the individual, the most apparent, and perhaps only, lead in his investigation into the unexplained screaming or crying for help.

¶ 21 As a result, he began to question the individual, whose answers were inconsistent with the observable facts. This further heightened Deputy Spotten's suspicion of the already unusual nature of the individual's presence behind the apartment complex, far from his home, at so late an hour. In furtherance of his investigation, Deputy Spotten decided to momentarily detain the individual in order to run checks that could potentially provide information relevant to his investigation into the cries for help, as well as information relevant to Deputy Spotten's own safety, e.g., whether the individual had a record indicating prior violent behavior or a

history of mental illness. We conclude that, viewing the facts in their totality and considering the rational inferences drawn from those facts, Deputy Spotten's detention of Markland in order to run a warrants check was justified at its inception by a reasonable suspicion that crime was afoot and that Markland was connected to that crime.

¶ 22 In reaching the opposite conclusion below, the court of appeals relied primarily upon two of its previous decisions, *Ray*, 2000 UT App 55, 998 P.2d 274, and *State v. Trujillo*, 739 P.2d 85 (Utah Ct.App.1987). However, both decisions are distinguishable from the present case.

¶ 23 In *Ray*, officers detained a woman after receiving a call from a convenience store owner expressing concern that the woman in question had been in front of the convenience store for approximately two hours. 2000 UT App 55 at ¶¶ 2–3, 998 P.2d 274. The store owner did not express any suspicion that the woman was somehow connected to past, present, or future criminal activity. *Id.* at ¶ 2. The officers questioned the woman, who stated that she was waiting for a ride, and then asked for identification in order to run a warrants check. *Id.* at ¶¶ 4–5. The officers in *Ray* testified that they did not suspect the woman of any criminal activity when they took her identification in order to run a warrants check. *Id.* at ¶ 5.

¶ 24 In *Trujillo*, an officer detained three individuals who had been "peering" into store windows at approximately 3:30 a.m. 739 P.2d at 86. The court of appeals concluded that the only facts offered in support of the detention were the late hour, the fact that the individuals appeared nervous and were in a high-crime area, and the presence of a "suspicious" knapsack. *Id.* at 86, 89. Although the court concluded that the detention in that case was not justified by reasonable suspicion, it twice pointed out that the detaining officer had not received any reports of criminal activity in the area that day. *Id.*

¶ 25 The present case is quite different from both *Ray* and *Trujillo*. Here, we are not dealing with a situation, as in *Ray*, where an officer admitted that he or she did not suspect criminal activity at the inception of a challenged detention. That distinction is fatal to any attempt to analogize *Ray* to the present case. The analogy to *Trujillo* is also imperfect because the officer in *Trujillo* lacked a critical fact present in this case: a contemporaneous report of suspicious circumstances in the area in which Markland was detained.[2]

---

**2.** Markland argues that the cries for help could have been precipitated by noncriminal activity. That is certainly the case. However, the question is not whether a noncriminal explanation for the cries might exist, but whether Deputy Spotten could have reasonably suspected that criminal activity was afoot considering his knowledge of the reported cries for help and the additional information obtained during his subsequent investigation. The dissent argues that we should ignore the dispatch report when analyzing whether Deputy Spotten possessed reasonable suspicion of criminal activity. According to the dissent, reliance on the dispatch report is unwarranted because (1) the appellate record contains no facts relating to the reliability of the call precipitating the report, and (2) Deputy Spotten was unable to uncover information connecting Markland to the report. In support of the first proposition, the dissent cites a series of cases in which 911 calls or dispatch reports provided the sole basis for effecting an investigatory detention. In essence, the cases relied upon by the dissent stand for the undisputed principle that an investigatory detention cannot be justified by an unreliable or unsubstantiated dispatch report alone. However, in this case, the dispatch report served a different function: it justified the initiation of an investigation, not the initiation of an investigatory detention. As to the dissent's second proposition, we note that there was a connection between Markland and the dispatch call: Markland was the only individual Deputy Spotten observed in the relatively secluded area where the screams reportedly occurred, and Deputy Spotten found him in that area at an odd hour just five minutes after hearing the dispatch report. Deputy Spotten should not have been expected or required to completely ignore the suspicious backdrop provided by the dispatch report when investigating and evaluating the additional suspicious circumstances attendant to Markland's presence behind the apartment complex. Such an integral aspect of the officer's background knowledge cannot be excised from the reasonable suspicion determination. That said, we note that the dispatch report serves as only one of the five factors that the district court relied upon when upholding Markland's detention. Even in the absence of an unassailable, inculpatory connection between Markland and the dispatch report, we conclude that the report was properly weighed as a factor contributing to reasonable suspicion.

¶ 26 When viewed in their totality, the facts of this case compel our conclusion that Deputy Spotten possessed reasonable suspicion that crime was afoot and that Markland, the sole individual he observed in the area, was connected to that crime. Having so concluded, we next address Markland's argument that we can nevertheless affirm the court of appeals by holding that the warrants check impermissibly exceeded the permissible scope of his detention.

## II. THE WARRANTS CHECK WAS WITHIN THE PERMISSIBLE SCOPE OF MARKLAND'S DETENTION

 ¶ 27 Markland contends that, under the circumstances of his detention, running a warrants check would not aid Deputy Spotten in either confirming or alleviating his suspicion about Markland's connection to the reported cries for help. He argues that the drugs uncovered after his arrest should, therefore, be suppressed because they were obtained as the result of a warrants check that exceeded the permissible scope of his detention. We disagree.

¶ 28 In upholding the constitutionality of a stop-and-identify statute,[3] the United States Supreme Court recently granted implicit approval of the use of warrants checks when undertaken as part of a level-two detention, noting that "[k]nowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere." *Hiibel v. Sixth Judicial Dist. Court,* 542 U.S. 177, 124 S.Ct. 2451, 2458, 159 L.Ed.2d 292 (2004). That pronouncement is not out of step with prior case law. *See, e.g., United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (stating that the ability to "check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice"); *United States v. Thompson,* 282 F.3d

673, 679 (9th Cir.2002) (holding that, under the circumstances, a warrants check taking approximately twenty minutes did not exceed the scope of an investigatory detention).

¶ 29 Our own case law is similarly in accord with the view that the warrants check conducted by Deputy Spotten was within the permissible scope of Markland's detention. In *State v. Lopez,* 873 P.2d 1127, 1133 (Utah 1994), we explained that implementing general Fourth Amendment principles requires a balancing of the need to breach the wall of personal security with the extent of the particular invasion. In that case, we noted that "the government interest in arresting citizens who have outstanding warrants is substantial." *Id.* We then balanced that interest against the inconvenience occasioned by a warrants check, stating that "the impact of a warrants check on the scope of detention is minimal because computerized data storage renders the time for a records check negligible." *Id.* (internal quotation omitted). Consequently, in *Lopez,* we upheld the constitutionality of a warrants check in the course of a routine traffic stop so long as the check does not unreasonably extend the time of detention. *Id.*

¶ 30 Markland, without attempting to distinguish the case law cited above, refers us to *State v. Chapman,* 921 P.2d 446 (Utah 1996), which he contends controls the outcome in this case. In *Chapman,* an officer conducted checks on an individual detained on suspicion of violating a loitering ordinance and thereby discovered that the individual was a gang member known to carry a gun. *Id.* at 448. The officer obtained permission to search the vehicle in which the gang member was found, and discovered a gun stored in accordance with Utah law. *Id.* The officer then ran a stolen weapons check to determine whether the gun was stolen. *Id.* We held that the stolen weapons check was not properly related in scope to the circumstances justifying the individual's detention—specifically, suspicion of a loitering ordinance violation. *Id.* at 453.

---

**3.** Stop-and-identify statutes are typically hybrid statutes combining elements of vagrancy laws with language aimed at regulating police conduct during investigatory stops. *See Hiibel v. Sixth Judicial Dist. Court,* 542 U.S. 177, 124 S.Ct. 2451, 2456, 159 L.Ed.2d 292 (2004).

¶ 31 Upholding the validity of the warrants check in the present case is wholly consistent with *Chapman.* In this case, Deputy Spotten did exactly what *Chapman* allows, namely—take steps to further investigate the suspected wrongdoing and protect officer safety. In *Chapman,* we concluded that the officer only strayed into unconstitutional territory when he ran the stolen weapons check, an action wholly unrelated to a suspected violation of a loitering ordinance and conducted in the absence of an articulable suspicion that the gun in question was stolen. *Id.* at 454.

¶ 32 In the present case, there was no such overreaching by Deputy Spotten. The warrants check was adequately related in scope to the reasons justifying Markland's detention—specifically, Deputy Spotten's suspicion that Markland was connected to a crime relating to the reported screaming or crying for help. As previously noted, when an officer is conducting an initial investigation into criminal activity, a warrants check can quickly provide highly relevant information that serves to either heighten or alleviate the suspicion that originally justified the check. *See State v. Johnson,* 805 P.2d 761, 763–64 (Utah 1991) (quoting an officer's testimony indicating that a warrants check is a helpful investigative tool). Also, as noted above, a warrants check can prove invaluable to officer safety.

¶ 33 In this case, the warrants check could have established that Markland had a history of violent crime, simultaneously bolstering Deputy Spotten's suspicion that Markland was connected to criminal activity and alerting Deputy Spotten that he was confronting a potentially violent individual. Conversely, if Deputy Spotten had discovered that Markland possessed no criminal background, his level of suspicion may have decreased to a point at which no further investigation into Markland's potential connection to the cries for help would be warranted.

¶ 34 The warrants check itself lasted approximately five minutes, a relatively minimal intrusion, and had the potential to reveal information relevant to Deputy Spotten's suspicion that Markland was connected to the cries for help. We therefore hold that the warrants check was within the permissible scope of Markland's detention.

## CONCLUSION

¶ 35 We conclude that the totality of the facts, combined with rational inferences drawn from those facts, gave rise to a reasonable, articulable suspicion that Markland was connected to the reported cries for help and, by rational inference, criminal activity. As a result, Markland's detention was constitutionally justified. We also conclude that Deputy Spotten acted within the permissible scope of the detention when he conducted a warrants check that had the potential to supply information relevant to the investigation that gave rise to Markland's detention. Given these conclusions, we reverse and remand for further proceedings consistent with this opinion.

¶ 36 Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.

DURHAM, Chief Justice, dissenting:

¶ 37 I respectfully dissent. This is indeed a close case but I am simply not persuaded that the officers had sufficient information to permit a lawful warrants check. My concern is that the majority opinion may be interpreted to mean that reasonable suspicion may be based on an ambiguous telephone report with no indicia of reliability and no corroboration that there is even criminal activity going on, let alone that the defendant is somehow connected to it.

¶ 38 In most jurisdictions there appears to be no presumption that a call to police, even if it is a 911 call, contributes to a police officer's reasonable suspicion. Rather, either the call itself must be highly reliable or the substance of the call must be somehow corroborated. *See, e.g., United States v. Terry–Crespo,* 356 F.3d 1170, 1173 (9th Cir.2004) ("Provided Mr. Domingis's 911 call exhibited sufficient 'indicia of reliability,' it could have provided Officer Kulp with reasonable suspicion justifying a *Terry* stop."); *United States v. Quarles,* 330 F.3d 650, 656 (4th Cir.2003) ("[T]he 911 call was not anonymous and provided sufficient information about [the caller]

and about the defendant to find [the caller] credible and knowledgeable. We also believe that the 911 call provided sufficient reasonable suspicion to justify stopping the defendant."); *United States v. Nelson,* 284 F.3d 472, 481 (3d Cir.2002) ("[W]e assess whether the [telephone] communications to the police possessed sufficient indicia of reliability, when considering the totality of the circumstances, for us to conclude that the officers possessed an objectively reasonable suspicion sufficient to justify a Terry stop."); *United States v. Jones,* 242 F.3d 215, 218 (4th Cir. 2001) (holding an anonymous 911 call that several black males were causing a disturbance did not justify police stopping a car containing black males).

¶ 39 In line with these cases, this court has also analyzed dispatch calls to officers on patrol in order to determine whether the calls were sufficiently reliable to provide police with reasonable suspicion. In *State v. Pena,* 869 P.2d 932 (Utah 1994), for example, we held that a dispatch call relaying information obtained from a 7–Eleven store clerk, who had reported a theft at the store and had described the suspect and his car, including its license plate number, did contain sufficient detailed information to justify police in making an initial stop of an individual matching the suspect's description. *Id.* at 934, 940; *see also State v. Bruce,* 779 P.2d 646, 650–51 (Utah 1989) (holding that police who received a radio bulletin were justified in stopping the car identified in the bulletin as long as the officers who had issued the bulletin originally possessed sufficient articulable facts to constitute reasonable suspicion).

¶ 40 Here, the only information about the call in the record is that the police received a report of the call from dispatch. Thus, in this case, it would be impossible to conduct the reliability analysis that is often used to analyze whether police are justified in relying on a call, either alone or in combination with other factors, as a basis for reasonable suspicion. Moreover, the police were unable to corroborate the report of a scream or cry for help with other related indications of criminal activity.

¶ 41 Thus, based on the record before us, all we have is an uncorroborated and, for all we know, anonymous call, in combination with completely unrelated "suspicious" behavior by someone who was not even identified by the caller as the possible perpetrator. An identity request for possible future reference was, I believe, permissible, but the warrants check was not based on reasonable suspicion. I would affirm the court of appeals.