2007 UT App 409

STATE of Utah, Plaintiff and Appellee,

v.

Taecia B. PROWS, Defendant and Appellant.

No. 20060273–CA.

Court of Appeals of Utah.

Dec. 28, 2007.

Rehearing Denied March 26, 2008.

Jay W. Spillers, St. George, for Appellant.

Mark L. Shurtleff, atty. gen., and Jeanne B. Inouye, asst. atty. gen., Salt Lake City, for Appellee.

Before BENCH, P.J., GREENWOOD, Associate P.J., and DAVIS, J.

OPINION

GREENWOOD, Associate Presiding Judge:

¶ 1 Defendant Taecia B. Prows entered a plea of no contest to burglary and theft, both third degree felonies. She appeals, challenging the trial court's denial of her motion to suppress evidence obtained during her arrest. We affirm.

## BACKGROUND

¶ 2 At approximately 2:30 a.m. on December 3, 2003, Albert Polumbo, who was employed to watch over a portion of the Aspen Hills subdivision, a gated mountain community in Sanpete County, Utah, heard "what sounded like a truck and [a] couple of ATV's [sic] . . . stuck in the snow." Polumbo left his trailer and walked toward the noise to see if he could help. Soon after, he "heard some commotion over by [his neighbor,] Kurt Parry's, cabin . . . [and he] noticed that there weren't any lights on over there." He also heard "three distinct voices [and] some cursing," and someone shouting, "Open the garage door." It also "sounded [to Polumbo] like someone was loading items in the back of a pickup."

¶ 3 Polumbo called 911 and told dispatch he "thought a burglary might have been in progress at [his] neighbor's cabin." He "stayed on the phone for a little while and told [dispatch] what [he] was hearing." He "believe[s] he mentioned that it sounded like there were at least two, possibly three people there." Because it was late at night, the only vehicle description he could relay was that the vehicle was possibly a small pickup truck or a Jeep. Dispatch then called Sheriff Kay Larsen[1] and police officer Jeff Greenwell to report that there was a burglary in progress in Aspen Hills. At some time during the evening, Polumbo spoke with the sheriff directly and informed him that "it sounded like somebody was loading items in the back of a pickup . . . and that . . . the truck had started to pull out from . . . Kurt Parry's cabin." Polumbo also stated that it was possible that tools had been taken from the garage, and that the vehicle was leaving the cabin, traveling south out of the subdivision.

¶ 4 In response to Polumbo's information, Sheriff Larsen and Officer Greenwell met at the subdivision's north gate.[2] Sheriff Larsen told Officer Greenwell to stay by the north gate in case the suspects headed in that direction, and Sheriff Larsen traveled toward the south gate. While en route, Sheriff Larsen saw a vehicle traveling south in the subdivision. He lost sight of it through the trees and called Officer Greenwell on his cell phone, telling him to "head back down towards Mount Pleasant and see if [he] could intercept [the vehicle]." As he drove south, Officer Greenwell observed a dark colored Toyota 4Runner. He paced the car going sixty-five miles per hour in a forty-five mile per hour zone. Because of "the report of a possible burglary in progress and no other vehicles in the area," Officer Greenwell conducted a "felony stop"[3] and ordered Defendant, the driver, out of the vehicle.

¶ 5 Once Defendant exited the vehicle, Officer Greenwell patted her down, handcuffed her, and had her sit down on the opposite side of the road. Then, Captain Gary Larsen arrived and Officers Larsen and Greenwell approached the vehicle, which still had two other passengers in it. Captain Larsen asked the front seat passenger, Travis Williams, to exit. As Williams stepped out of the vehicle, "[Captain Larsen] could see a black-handled knife protruding out from underneath the seat." He also saw "what appeared, at that time, to be shell casings." At the same time, Officer Greenwell looked into the vehicle with his flashlight, and saw several tools in the back seat. "Because [he] knew

1. Two law enforcement officers with the last name of Larsen were involved in Defendant's arrest: Sheriff Kay Larsen and Captain Gary Larsen.

2. There are two gates which provide access to the subdivision, the north gate and the south gate.

3. The parties refer to the initial stop as a "felony stop." For purposes of the Fourth Amendment, Utah recognizes three levels of encounters between citizens and law enforcement: (1) an officer may approach a citizen at anytime [sic] and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an "articulable suspicion" that the person has committed or is about to commit a crime; however, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed. *State v. Alverez*, 2006 UT 61, ¶ 10, 147 P.3d 425 (citation omitted). Because no one in this case was immediately arrested, we assume the parties are characterizing the stop as a level two encounter.

there was one other person in [the vehicle] and [he] wanted some protection," Captain Larsen searched and handcuffed Williams, and sat him in front of the patrol car. Captain Larsen then asked Williams if there were any other weapons in the vehicle, and when he said no, Captain Larsen said, "I'm going to look, is that okay?" And Williams, who was the owner of the vehicle, said, "Okay." As Officer Greenwell and Captain Larsen were removing the third passenger from the vehicle, Sheriff Larsen arrived, and told Captain Larsen there was a high probability that tools had been taken from the cabin, and that he received "that information from the witness up on the mountain." As the third passenger was exiting the vehicle, Captain Larsen saw a tarp in the back seat partially covering large tools.

¶ 6 Based on the presence of the tools, the information about tools being stolen, and because Captain Larsen had obtained consent from Williams, the vehicle owner, the officers searched the vehicle and found what appeared to be marijuana and drug paraphernalia. Captain Larsen then read the back seat passenger his Miranda rights and interviewed him. The passenger stated that the three individuals had been up on the mountain in the Aspen Hills subdivision, they got stuck in the snow, went into a cabin, and took a tow strap and two four wheelers. After pulling their truck out, they went back to the cabin, entered the garage through a basement window, and loaded tools from the garage into the truck.

¶ 7 Defendant was subsequently charged with burglary, theft, speeding, and possession of a controlled substance. After the preliminary hearing, Defendant filed a motion to suppress any evidence obtained during her arrest. The trial court denied the motion. Defendant entered a plea of no contest to the burglary and theft counts, reserving the right to appeal the motion to suppress, and the State dismissed the remaining charges.

¶ 8 Defendant appeals, claiming the trial court erred by denying her motion to suppress because (1) Officer Greenwell did not have the necessary reasonable articulable suspicion to effectuate a stop for the alleged burglary; (2) Officer Greenwell unlawfully exceeded the scope of the stop when he frisked Defendant; and (3) law enforcement "unlawfully extended the scope of the stop by requesting to search the vehicle."

## ISSUE AND STANDARD OF REVIEW

¶ 9 Defendant argues that the trial court erred by denying her motion to suppress. We review the trial court's ruling on a motion to suppress for correctness. *See State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699. "In search and seizure cases, no deference is granted to ... the district court regarding the application of law to the underlying factual findings." *State v. Alverez*, 2006 UT 61, ¶ 8, 147 P.3d 425.

## ANALYSIS

### I. Reasonable Suspicion to Effectuate a Level Two Stop

¶ 10 Defendant argues that the trial court erred in denying her motion to suppress because Officer Greenwell lacked first-hand knowledge of the alleged crime and the citizen informant's information was insufficient and unreliable.[4] "A limited crime investigation stop ... must meet a two-prong test to overcome the Fourth Amendment's prohibition against unreasonable seizures. First, the officer's initial stop must be justified; second, subsequent actions must be within the scope of the circumstances justifying the stop." *City of St. George v. Carter*, 945 P.2d 165, 168 (Utah Ct.App.1997) (citation and internal quotation marks omitted). Defendant argues, first, that the stop was not justified at its inception because Officer Greenwell lacked reasonable articulable suspicion because he was acting on information he obtained second hand from Sheriff Larsen. Second, Defendant asserts that the citi-

4. Defendant raises additional arguments, such as whether Officer Greenwell was conducting an improper checkpoint and whether Officer Greenwell pursued a speeding stop; however, we do not address these arguments because they are without merit. *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989) (stating that we "need not analyze and address in writing each and every argument, issue, or claim raised and properly before us on appeal").

zen informant's information was unreliable and insufficient.

A. Reasonable Articulable Suspicion

¶ 11 Under the Fourth Amendment, "[a] stop is justified if there is a reasonable [articulable] suspicion that the defendant is involved in criminal activity." *State v. Case*, 884 P.2d 1274, 1276 (Utah Ct.App. 1994). "While the required level of suspicion is lower than the standard required for probable cause to arrest, the same totality of facts and circumstances approach is used to determine if there are sufficient 'specific and articulable facts' to support reasonable suspicion." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Thus, we " 'view the articulable facts in their totality and avoid the temptation to divide the facts and evaluate them in isolation.' " *State v. Markland*, 2005 UT 26, ¶ 11, 112 P.3d 507 (quoting *State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590).

¶ 12 Furthermore, we " 'judge the officer's conduct in light of common sense and ordinary human experience and ... accord deference to an officer's ability to distinguish between innocent and suspicious actions.' " *Id.* (alteration in original) (quoting *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir.2001)). We further recognize that law enforcement officers are entitled to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotation marks omitted).

¶ 13 In light of this standard, Defendant argues that the trial court erred in denying her motion to suppress because Officer Greenwell lacked reasonable articulable suspicion based on the fact that he "possessed no information that would allow him to effectuate a felony stop."

It is not, however, necessary that such objectively reasonable articulable suspicion rest solely on the knowledge of the detaining officer. Rather, the collective knowledge doctrine (sometimes referred to as the fellow officer rule) allows the objective-ly reasonable articulable suspicion to be based on the totality of the circumstances and "the collective knowledge of all the officers involved."

*United States v. Watkins*, No. 06–3271, 243 Fed.Appx. 356, 358 (10th Cir. June 14, 2007) (quoting *United States v. Hinojos*, 107 F.3d 765, 768 (10th Cir.1997) and citing *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir.2006); *United States v. Miranda–Guerena*, 445 F.3d 1233, 1237 (9th Cir.2006); *United States v. Cervine*, 347 F.3d 865, 871 (10th Cir.2003)). Applying the fellow officer rule without referring to it as such, this court has explained that a stop "made in objective reliance upon a flyer or bulletin is proper 'if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop.' " *City of St. George*, 945 P.2d at 168 (quoting *United States v. Hensley*, 469 U.S. 221, 233, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). Thus, the reasonableness of Defendant's stop turns, in part, on whether Sheriff Larsen had reasonable articulable suspicion to justify the stop at its inception.

¶ 14 Sheriff Larsen asked Officer Greenwell to intercept Defendant's vehicle based, in part, on information he received from Polumbo, a citizen informant. "[A]n informant's tip constitutes reasonable suspicion to justify a detention or seizure of a vehicle and its driver if the information [ (1) ] is reliable, [ (2) ] provides sufficient detail of criminal activity, and [ (3) ] is confirmed by the investigating officer." *Id.* at 169. Based on these factors, we conclude that Sheriff Larsen had reasonable articulable suspicion to effectuate a level two stop, and further, based on the fellow officer rule and the totality of the circumstances, so did Officer Greenwell.

¶ 15 Under the first factor of the citizen informant test, Polumbo's tip was reliable because Polumbo gave his identifying information. As this court has explained, because the police may subject the informant to penalty if the information is false, a citizen informant's tip is considered "highly reliable" when the citizen gives his or her identifying information. *Id.* Moreover, "unlike a paid police informant, the uncompensated citizen-

informer's motive is community concern rather than self interest." *Id.* Thus, "[t]he veracity of identified private citizen informants (as opposed to paid or professional criminal informants) is generally presumed in the absence of special circumstances suggesting that they should not be trusted." *United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007). In this case, Polumbo gave law enforcement sufficient identifying information, i.e., his name, his occupation, his address, and his cell phone number. Further, there were no special circumstances present to indicate that the tip was untrustworthy. Thus Polumbo's tip was "highly reliable," *City of St. George v. Carter*, 945 P.2d 165, 169 (Utah Ct.App.1997), and the first factor of reasonable suspicion based on a citizen informant is satisfied.

¶ 16 Regarding the second factor, the citizen informant must provide "enough detail about the criminal activity, i.e., illegal activity observed, description of the vehicle, license number, and location to support reasonable suspicion." *Id.* at 169. Under this standard, the information Polumbo gave law enforcement was sufficiently detailed because Polumbo indicated that he was a night watchman in the subdivision where the suspicious activity was taking place; he heard what sounded like a burglary in progress; the suspects, approximately three people, were at his neighbor's house loading what sounded like tools into a truck; and they were unlikely to be the owner because the lights were not on and there was cursing. Polumbo also told the authorities that the vehicle, a Jeep or a truck, was leaving, traveling south out of the subdivision.

¶ 17 In addition to the added factors of time of day and lack of any other traffic in the area, this information is sufficiently detailed to satisfy the second factor of reasonable suspicion. *See Kaysville City v. Mulcahy*, 943 P.2d 231, 237 (Utah Ct.App. 1997) (concluding similarly based on an informant's tip that a "drunk individual had been at his front door and had driven away in a white car-possibly a Toyota-heading out of his subdivision toward the main road in front of Davis High School," coupled with the time of day and lack of any other traffic (internal quotation marks omitted)). Moreover, the tip's veracity is strengthened by the fact that Polumbo was on the phone with law enforcement while he was observing the suspicious activity. "A tip is more reliable if it is apparent that the informant observed the details personally, instead of simply relaying information from a third party." *Id.* at 236. Consequently, the information Polumbo provided was sufficiently detailed to satisfy the second factor to establish reasonable suspicion.

¶ 18 Under the third factor of the citizen informant test, a tip is a sufficient basis for reasonable suspicion if "[t]he officer [can] corroborate the tip either by observing the illegal activity or by finding the person, the vehicle and the location substantially as described by the informant." *Id.* Although Polumbo could not identify the exact make and model of the vehicle, he gave Sheriff Larsen information regarding the size of the vehicle, when it was leaving the subdivision, and in which direction it was headed. Almost contemporaneously, Sheriff Larsen spotted a vehicle traveling south, and upon losing sight of it through the trees, called Officer Greenwell and told him to travel in the direction of the vehicle to intercept it. Shortly thereafter, Officer Greenwell pulled Defendant over, driving a dark colored Toyota 4Runner as it was traveling south. Based on these factors, i.e., the description of the vehicle, the direction it was traveling, the time and the location, and the fact that there were no other cars in the area, the third factor regarding corroboration is satisfied. *See id.* at 237–38 (stating that corroboration was present when a few minutes after the tip was provided, the officer found " 'the described vehicle going in the direction and on the highway reported by the caller.' " (quoting *State v. Markus*, 478 N.W.2d 405, 408 (Iowa Ct.App.1991))).

¶ 19 In sum, because all three factors regarding sufficiency of a citizen informant's tip are satisfied, we conclude that Sheriff Larsen had reasonable articulable suspicion to effectuate a level two encounter. Further, because Sheriff Larsen ordered Officer Greenwell to intercept the vehicle traveling south, under the fellow officer's rule or the

collective knowledge doctrine, Officer Greenwell also had reasonable articulable suspicion to effectuate the stop. Our conclusion is bolstered by the fact that in addition to Sheriff Larsen's order, Officer Greenwell made the determination to pull the 4Runner over based on his own experience and the unique factors present, including that this event occurred in an isolated mountain community, late at night, with no other vehicles nearby, and Officer Greenwell observed the vehicle Defendant was driving close in time to Sheriff Larsen having seen a vehicle traveling in the same direction. Thus, we conclude that Officer Greenwell had reasonable articulable suspicion to effectuate a level two stop.

## II. Scope of the Stop

¶ 20 Defendant next argues that Officer Greenwell exceeded the scope of the stop when he ordered Defendant out of the vehicle and searched her.[5] The reasonableness of a protective frisk is "evaluated objectively according to the totality of the circumstances." *State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590. Thus, the "court should question whether the facts available to the officer at the moment of the [frisk] ... warrant a [person] of reasonable caution [to believe] that the action taken was appropriate." *Id.* (internal quotation marks omitted). Two important factors influence our decision that Officer Greenwell did not exceed the scope of the stop when he had Defendant exit the vehicle and he frisked her. First, the stop was a vehicle stop, made during the investigation of a suspected burglary. As the United States Supreme Court has made clear, "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). There is an " 'inordinate risk confronting an officer as he approaches a person seated in an automobile.' " *Id.* (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)). Therefore, law enforcement may order a sus-

pect out of a vehicle and conduct a frisk "if there is a reasonable belief that [he or she] is armed and dangerous." *Id.* Furthermore, this court has explained that certain facts, including the nature of certain crimes, one of which is burglary, "may give rise to a reasonable suspicion the suspect may be armed." *State v. Lafond*, 2003 UT App 101, ¶ 19, 68 P.3d 1043. Because the stop in this case was justified at its inception as one made to investigate a possible burglary, Officer Greenwell was justified in ordering Defendant out of the car and frisking her. This is especially valid considering the added facts that at the time Officer Greenwell initiated the stop, it was dark, he was alone, and there were three individuals in the vehicle.

## III. Exploitation of a Prior Illegality

¶ 21 Finally, Defendant claims the vehicle search was invalid because (1) "stopping the vehicle for speeding did not give the officers probable cause to request to search the vehicle"; (2) the "request to search" was not justifiable based on a safety risk; (3) the consent was coerced because "the officers exhibited a show of force in obtaining the consent to search ... [by] remov[ing the owner] and ... handcuff[ing] him while asking whether they could search the vehicle for weapons"; and (4) the search was invalid because the initial stop was invalid, or exceeded the permissible scope because it was a speeding stop.

¶ 22 We do not address the merits of these arguments because Defendant has no standing to challenge the vehicle owner's consent to search.

> "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since

---

5. The basis for Defendant's argument is that Officer Greenwell stopped Defendant for speeding; however, as previously discussed, Officer Greenwell had reasonable articulable suspicion to ef-

fectuate a level two stop based on the alleged burglary. Thus the speeding aspect of the stop is irrelevant.

the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citations omitted) (quoting *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)). Thus, a person who does not own the automobile that was searched or the contents that were seized within the vehicle has no standing to challenge the search on the basis of a Fourth Amendment violation. *See id.; see also State v. Valdez,* 689 P.2d 1334, 1335 (Utah 1984) ("Defendant concedes that he did not own the car or the attache case containing the evidence complained of, and he has failed to show that he had any legitimate expectation of privacy in the effects searched. Under long-established precedent, he lacks any standing to complain of the resulting search.").

¶ 23 Defendant nonetheless argues that the consent was invalid because the police never established who the car owner was before seeking consent to search. The Supreme Court rejected this argument in *Rakas,* stating that the "proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." 439 U.S. at 132 n. 1, 99 S.Ct. 421. Once the State argued that Defendant lacked standing to challenge the search, it was Defendant's obligation to establish a property interest in the vehicle or the seized contents, and Defendant failed to do so in the trial court, and does not do so on appeal. *See id.* (concluding similarly). Thus, any challenge to the consent to search the vehicle fails.

## CONCLUSION

¶ 24 We conclude that Sheriff Larsen and Officer Greenwell had reasonable articulable suspicion to effectuate a level two stop; Officer Greenwell's frisk of Defendant did not exceed the purpose of the stop; and finally, Defendant does not have standing to challenge the search of the vehicle or the owner's consent to the same. Consequently, we affirm the trial court's denial of Defendant's motion to suppress evidence obtained during her arrest.

¶ 25 WE CONCUR: RUSSELL W. BENCH, Presiding Judge, and JAMES Z. DAVIS, Judge.