*This opinion is subject to revision before final publication in the Pacific Reporter*

**2013 UT 58**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Appellee,*

*v.*

CRAIG GURULE,
*Defendant and Appellant.*

No. 20111053
Filed October 1, 2013

Fourth District, Provo Dep't
The Honorable Samuel D. McVey
No. 101403433

Attorneys:

John E. Swallow, Att'y Gen., Jeffrey S. Gray, Asst Att'y Gen.,
Salt Lake City, for appellee

Aaron P. Dodd, Provo, for appellant

JUSTICE PARRISH authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE LEE joined.

JUSTICE PARRISH, opinion of the Court:

### INTRODUCTION

¶ 1    After pleading guilty to possession of a controlled substance in a drug free zone, Craig Gurule was sentenced to a term of incarceration for five years to life. Gurule reserved his right to appeal the district court's ruling denying his motion to suppress evidence obtained through a search of his vehicle.

¶ 2    On appeal, Gurule argues that the search was unlawful because the officers did not possess reasonable suspicion that there were drugs in his vehicle when they stopped him for a minor traffic infraction. He further argues that the officers manipulated his Adult Probation and Parole (AP&P) agent into requesting that they conduct a warrantless parole search of Gurule's vehicle. Gurule argues that this search violated both his parole agreement and his state and federal constitutional rights. The State responds that the officers had reasonable suspicion that Gurule possessed illegal

drugs, justifying Gurule's detention. The State further responds that Gurule's AP&P agent possessed reasonable suspicion that Gurule had violated his parole and therefore reasonably requested that the officers search Gurule's truck on the agent's behalf.

¶ 3    We hold that the officers lacked reasonable suspicion that Gurule was engaged in or about to be engaged in criminal activity. They improperly extended the duration of Gurule's stop when they abandoned the original purpose of the stop—to investigate a minor traffic infraction—and instead undertook a prolonged investigation into Gurule's possible drug activity. The district court therefore erred when it denied Gurule's motion to suppress the evidence obtained through the officers' improper detention and search.

## BACKGROUND

¶ 4    On November 3, 2010, Officer Raymond Flores of the Springville Police Department received a call from dispatch indicating that an anonymous caller had reported seeing two Hispanic men exchange money and plastic baggies in the parking lot of an Allen's grocery store. The caller also reported that a gray Dodge truck was involved. The truck was registered to an individual with the last name of Luna.

¶ 5    Officer Flores and his partner, Detective Anderson, recognized the name Luna and the gray Dodge "as having past drug involvements." The officers therefore responded to the Allen's grocery store, but they did not see the gray Dodge truck. After waiting a few minutes, they observed a Hispanic male exit the Allen's store. Officer Flores recognized the man, but could not initially remember his name. The man got into a black Ford truck, and the officers ran the truck's license plate. The truck was registered to Andre Gurule, leading the officers to recognize the driver as Craig Gurule, Andre Gurule's son. Officer Flores knew of Gurule because citizen informants and other detectives had told him that Gurule was "possibly involved in drug activity."

¶ 6    Gurule left the parking lot and the officers followed in an unmarked police car. Officer Flores observed that Gurule's turn signal remained activated for approximately three blocks and that the passenger tires of the truck were riding on the fog line. While following Gurule, both officers remembered that he was on parole. Shortly thereafter, Officer Flores activated his overhead lights to initiate a traffic stop based on Gurule's failure to remain in his lane.

¶ 7 After Officer Flores turned on his lights, Gurule slowed down but did not immediately stop. Officer Flores testified that, during this time, Gurule "was not paying attention to the road," and that Gurule "would glance at [the officers] and . . . was glancing down towards the left side of his body." Only after Officer Flores activated two audible sirens did Gurule pull over and stop.

¶ 8 Officer Flores approached the driver's side of the truck and instructed Gurule to exit the vehicle. Officer Flores testified that he was concerned for his safety because Gurule did not immediately pull over, was watching the officers instead of the road, and had repeatedly looked down to his left. Officer Flores then asked Gurule why he had failed to pull over. Gurule responded that he had been using his cell phone, but Officer Flores testified that he had not seen Gurule doing so.

¶ 9 At this point, Detective Anderson conducted a frisk of Gurule, and Officer Flores performed a plain-view search of "the immediate area of the driver's side of the vehicle for weapons or anything [Gurule] was trying to conceal." Neither Detective Anderson nor Officer Flores found any weapons or contraband during their respective searches.

¶ 10 Despite the fact that these initial searches revealed nothing suspicious, the officers continued to detain Gurule and called for a canine unit. No canine units were available. Detective Anderson then called the on-call AP&P agent, Todd Dixon. Detective Anderson relayed the circumstances of the officers' detention of Gurule. Agent Dixon then asked the officers "to preform [sic] a search on the vehicle . . . for AP&P." Gurule's signed parole agreement stated that he would "permit officers of AP&P to search [his] person, residence, vehicle, or any other property under [his] control without a warrant . . . on reasonable suspicion to ensure compliance with conditions of [his] parole." One of the conditions of Gurule's parole was that he would "obey all state . . . laws."

¶ 11 The officers performed a lengthy and extensive search of Gurule's vehicle. Inside the driver's side door, the officers found a canvas bag containing a used syringe, a cut drinking straw with residue on it, and a plastic baggie holding 2.9 grams of methamphetamine.

¶ 12 The officers arrested Gurule. In a search incident to his arrest, they found $2,335 in cash on his person. The officers once again contacted AP&P to "let them know of [their] findings" and were told that AP&P would now send an agent to the scene.

¶ 13   When the AP&P agent arrived, she requested that the officers assist her in an AP&P parole search of Gurule's home. During the search of Gurule's home, the officers found video surveillance equipment that was recording the front yard and street, a digital scale, and a small amount of marijuana.

¶ 14   Gurule was charged with possession of a controlled substance with intent to distribute in a drug-free zone with a prior distribution conviction enhancement for possession of methamphetamine; possession or use of a controlled substance in a drug-free zone with a prior distribution conviction enhancement for possession of marijuana; possession of drug paraphernalia in a drug-free zone; possession, use, or control of a vehicle with a compartment for contraband; driving on a suspended driver's license; and failure to stay in one lane. The State later dismissed the marijuana and drug paraphernalia charges stemming from the search of Gurule's house because he entered a plea and was sentenced on those charges in Spanish Fork Justice Court.

¶ 15   Gurule filed a motion to suppress all of the evidence found during the searches of his person, truck, and house. Gurule argued that after he was stopped for a minor traffic infraction, he was unlawfully detained without reasonable suspicion of further illegal activity and that the evidence was therefore illegally obtained. He also argued that the officers' search of his truck on behalf of AP&P was illegal because AP&P improperly authorized the officers to search his truck outside the presence of an AP&P agent.

¶ 16   The district court denied Gurule's motion. It held that the anonymous tip about drug dealing at the Allen's store, combined with the officers' knowledge of Gurule's background, Gurule's furtive movements after the officers turned on their lights, and Gurule's assertion that he failed to immediately pull over because he was on a cell phone provided the officers with reasonable suspicion that Gurule was involved in illegal drug activity.

¶ 17   The district court also upheld the legality of the search conducted by the officers at the request of AP&P. Specifically, it held that Agent Dixon possessed reasonable suspicion that Gurule had violated the conditions of his parole and that "there was no pretext or other funny business going on" between the officers and Agent Dixon. Because "[Agent] Dixon of his own volition asked [the officers] to search [Gurule's truck]," which "was directly related to [his] duty as a parole officer," the court concluded that the officers' search on behalf of AP&P was constitutionally valid.

¶ 18   The case was scheduled for a jury trial.  At the conclusion of the State's presentation during trial, Gurule entered a conditional guilty plea to possession of a controlled substance in a drug-free zone with a prior distribution conviction enhancement.  Pursuant to our decision in *State v. Sery*, 758 P.2d 935 (Utah 1988), he reserved the right to appeal the district court's ruling on his motion to suppress.  In return, the State dropped all other charges.  Gurule timely appealed.

¶ 19   We have jurisdiction pursuant to Utah Code section § 78A-3-102(I).

## STANDARD OF REVIEW

¶ 20   "When reviewing a district court's denial of a motion to suppress, [we] disturb[] the district court's findings of fact only when they are clearly erroneous."  *State v. Baker*, 2010 UT 18, ¶ 7, 229 P.3d 650.  But "because there must be state-wide standards that guide law enforcement and prosecutorial officials," *State v. Hansen*, 2002 UT 125, ¶ 25, 63 P.3d 650 (internal quotation marks omitted), we afford no deference to the district court's "application of law to the underlying factual findings in search and seizure cases." *State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699.  Therefore, we review as a matter of law "whether a specific set of facts gives rise to reasonable suspicion." *State v. Pena*, 869 P.2d 932, 939 (Utah 1994).

## ANALYSIS

¶ 21  Gurule argues that his detention was unconstitutional under both the federal and Utah constitutions because the officers improperly extended the duration of his detention.[1]   The State argues that the extension of Gurule's detention was permissible because the officers had reasonable suspicion to justify an investigation into Gurule's possible drug activity.   While we conclude that the officers were justified in initially detaining Gurule

---

[1]  Although Gurule references both the federal and Utah Constitutions, he fails to undertake any independent analysis of the Utah Constitution.   While a defendant is not required to explicitly compare the state and federal constitutional provisions at issue, the "mere mention of state provisions will not suffice."   *State v. Tiedemann*, 2007 UT 49, ¶ 37, 162 P.3d 1106.  Because Gurule has failed to undertake any meaningful analysis under the Utah Constitution, we analyze his argument only under the Fourth Amendment to the U.S. Constitution.

for a traffic infraction and undertaking a protective frisk, we agree with Gurule that the officers unconstitutionally extended his detention when the encounter transitioned from a traffic stop to a drug investigation without reasonable suspicion.

¶ 22   The Fourth Amendment protects against "unreasonable searches and seizures."  U.S. Const. amend. IV.  "Although police must have a warrant to conduct most searches and seizures, officers may temporarily detain a vehicle and its occupants upon reasonable suspicion of criminal activity for the purpose of conducting a limited investigation of the suspicion."  *State v. Baker*, 2010 UT 18, ¶ 11, 229 P.3d 650 (internal quotation marks omitted).  Under the Fourth Amendment, we apply a two-part test to determine whether the duration and purpose of a detention is reasonable.  *Id.* ¶ 12.  "The first step is to determine whether the [traffic stop] was justified at its inception."  *Id.* (internal quotation marks omitted).  If so, we proceed to the second step, in which we "determine whether the detention following the stop was reasonably related in scope to the circumstances that justified the interference in the first place."  *Id.* (internal quotation marks omitted).

## I.  GURULE'S TRAFFIC INFRACTION
## JUSTIFIED THE TRAFFIC STOP

¶ 23   Shortly after Gurule left the Allen's parking lot, the officers observed his vehicle riding the fog line for a number of blocks.  "[A] police officer is constitutionally justified in stopping a vehicle if the stop is incident to a traffic infraction committed in the [officer's] presence."  *See State v. Lopez*, 873 P.2d 1127, 1132 (Utah 1994) (internal quotation marks omitted).  Gurule's traffic infraction therefore provided the officers with justification for the initial stop.  The officers were also justified in requesting Gurule's driver's license and vehicle registration, conducting a computer check, and issuing a citation.  *State v. Hansen*, 2002 UT 125, ¶ 31, 63 P.3d 650.  Because the only justification for the initial detention was a traffic infraction, however, the officers were required to "remain focused on the original purpose of the stop in the absence of reasonable suspicion justifying an expanded investigation."  *Simons*, 2013 UT 3, ¶ 38.

## II.  THE OFFICERS' PROTECTIVE FRISK AND
## PLAIN-VIEW-SEARCH WERE PROPER

¶ 23   Almost immediately after Gurule brought his truck to a stop, Officer Flores asked Gurule to exit the vehicle.  While he performed a plain-view search of the area around the driver's seat,

Detective Anderson performed a protective frisk of Gurule. Gurule contends that this frisk and plain-view search were unconstitutional. We disagree.

¶ 24 A seemingly benign traffic stop presents a very real threat to law enforcement officers. "Due to this inherent dangerousness, courts allow officers to take certain precautions to protect themselves without having to justify their actions based on reasonable suspicion." *State v. Warren*, 2003 UT 36, ¶ 24, 78 P.3d 590. One of these precautions is to allow officers to ask the driver and passengers to exit the vehicle during the pendency of the stop. *Id.* In *Warren*, we recognized that "once a motor vehicle has been lawfully detained for a traffic infraction, police officers may order the driver out of the vehicle to promote safety, even in the absence of reasonable suspicion, without violating the Fourth Amendment's proscription against unreasonable searches and seizures." 2004 UT 36, ¶ 24 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 108–11 (1977)). Because the officers were justified in stopping Gurule for his traffic infraction, Officer Flores's request that Gurule exit the vehicle was "at most a mere inconvenience [that] cannot prevail when balanced against legitimate concerns for the officer's safety." *Mimms*, 434 U.S. at 111.

¶ 25 Although an officer may order a driver from his vehicle during a traffic stop, the officer is not automatically entitled to conduct a protective search for weapons.[2] Rather, the officer must "point[] to 'specific and articulable facts which, taken together with the rational inferences from those facts,' would lead a reasonable person to conclude that the suspect may be armed and presently dangerous." *Warren*, 2003 UT 36, ¶ 29 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *see also State v. Baker*, 2010 UT 18, ¶ 26, 229 P.3d 650 ("During a lawful traffic stop, officers may conduct a pat-down search of the driver and other vehicle occupants 'upon reasonable

---

[2] In *Terry v. Ohio*, the U.S. Supreme Court held that an officer is justified in undertaking a protective frisk during a lawful detention when the officer reasonably believes that person is "armed and presently dangerous to the officer or others." 392 U.S. 1, 24 (1968). A protective frisk therefore requires both that the officer "[has] a valid reason for stopping the person," *State v. Warren*, 2003 UT 36, ¶ 13, 78 P.3d 590, and a reasonably objective belief that the suspect is armed and presently dangerous.

suspicion that they may be armed and dangerous.'" (*citing Arizona v. Johnson*, 555 U.S. 323, 332 (2009))).

¶ 26 During a protective frisk, "the only permissible objective . . . is the discovery of weapons that may be used against the officer or others." *State v. Peterson*, 2005 UT 17, ¶ 12, 110 P.3d 699 (internal quotations omitted). Because "[t]he touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security," *Mimms*, 434 U.S. at 108–09 (internal quotation marks omitted), we evaluate the propriety of Officer Flores's frisk based on the totality of the circumstances, *Terry*, 392 U.S. at 21.

¶ 27 Officer Flores testified that after he activated his overhead lights, Gurule did not immediately stop, but instead looked down to his left and made reaching movements towards the driver's side door of the truck. Officer Flores further testified that while Gurule slowed, he was looking back at the officers instead of paying attention to the road. When Gurule exited the vehicle, Detective Anderson noticed that Gurule had a suspicious bulge in his pants. And Officer Flores testified that he disbelieved Gurule's statement that he had been distracted by his cell phone because he had not observed Gurule use one. Both officers testified that this combination of factors led them to fear for their safety.

¶ 28 Under a totality of the circumstances analysis, we conclude that the officers observed "specific and articulable facts which, taken together with the rational inferences from those facts," would lead an officer to the reasonable conclusion that Gurule was armed and dangerous. *Terry*, 392 U.S. at 21. Our conclusion is bolstered by the fact that "the inherent dangerousness of all traffic stops . . . should be considered under the totality of the circumstances analysis." *Warren*, 2003 UT 36, ¶ 25. We hold that the officers were therefore justified in asking Gurule to exit his vehicle to perform a minimally-invasive protective search before continuing on with the original purpose of the traffic stop.

¶ 29 Similarly, Officer Flores's simultaneous plain-view search of the vehicle did not unconstitutionally infringe on Gurule's reasonable expectations of privacy. While an officer may not search a vehicle without probable cause, "an officer is not expected to ignore what is exposed to observation from a position where he is lawfully entitled to be, and he may view the interior of a vehicle from such a position." *State v. Lee*, 633 P.2d 48 (Utah 1981). Such

observations do not constitute a search within the meaning of the Fourth Amendment. *Id.* Because Officer Flores did not perform an invasive search of the vehicle, but rather only looked at what he could see in plain-view, his plain-view search was proper.

## III. THE OFFICERS LACKED REASONABLE SUSPICION TO INVESTIGATE GURULE FOR POSSIBLE DRUG CRIMES

¶ 30 During the pendency of a traffic stop, if officers gain reasonable suspicion of additional criminal activity, they may turn their attention from the original purpose of the traffic stop to "expediently investigate [their] new suspicion." *Baker*, 2010 UT 18, ¶ 13. But "officers must diligently pursue a means of investigation that is likely to confirm or dispel their suspicions quickly." *State v. Morris*, 2011 UT 40, ¶ 18, 259 P.3d 116 (internal quotation marks omitted); *see also Terry v. Ohio*, 392 U.S. 1, 31 (1968) (recognizing that an officer's reasonable suspicion that a person is or may be engaged in criminal activity allows the officer to detain that person for a brief time in order to investigate further).

¶ 31 To justify extending a detention, such "reasonable suspicion requires an objectively reasonable belief that an individual is engaged in or is about to be engaged in criminal activity." *State v. Brake*, 2004 UT 95, ¶32, 103 P.3d 699 (Utah 2004) (internal quotation marks omitted). Although officers "need not rule out the possibility of innocent conduct," *United States v. Arvizu*, 534 U.S. 266, 277 (2002), and "the likelihood of criminal activity need not rise to the level required for probable cause," *id.* at 274, reasonable suspicion "must be supported by specific and articulable facts and rational inferences, and cannot be merely an inchoate and unparticularized suspicion or hunch," *State v. Markland*, 2005 UT 26, ¶ 10, 112 P.3d 507 (citation and internal quotation marks omitted). *See also State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590 ("In determining reasonableness, 'due weight must be given, not to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience.'" (quoting *Terry v. Ohio*, 392 U.S. 1. 27 (1968)).

¶ 32 For instance, in *State v. Simons*, we reasoned that officers permissibly extended the defendant's detention arising from a traffic stop when the officers noticed drug paraphernalia in plain view. 2013 UT 3, ¶ 3, 296 P.3d 721. And in *State v. Morris*, we held that an officer possessed reasonable suspicion that a defendant was driving under the influence when the officer "smelled alcohol as soon as [the

defendant] rolled down his window." 2011 UT 40, ¶ 30, 259 P.3d 116.

¶ 33 We contrast these cases with our conclusion in *State v. Schlosser* that reasonable suspicion did not exist. 774 P.2d 1132 (Utah 1989). There, we reviewed the propriety of a highway patrol officer's search of the interior of a vehicle stopped for a minor traffic infraction. *Id.* at 1133–34. The State argued that the officer had reasonable suspicion of further illegal activity because after the officer initiated the stop, the driver and passenger were "bending forward, acting fidgety, turning to the left and to the right, and turning back to look at the officer." *Id.* at 1133. We concluded that those movements "[did] not, without more, show a reasonable possibility that criminal conduct had occurred or was about to occur." *Id.* at 1138. Rather, we observed that "[w]hen confronted with a traffic stop, it is not uncommon for drivers and passengers alike to be nervous and excited and to turn to look at an approaching police officer." *Id.* And we held that "[a] search based on such common gestures and movements is a mere 'hunch,' not an articulable suspicion that satisfies the Fourth Amendment." *Id.*

¶ 34 The State argues in its brief that even before the officers stopped Gurule for a traffic infraction, they possessed reasonable suspicion that Gurule was involved in drug dealing. The State supports its arguments with the following facts: (1) Gurule was seen leaving the location of a reported drug exchange, (2) the license plate reported to dispatch belonged to someone involved in the drug trade, (3) Gurule was Hispanic, (4) Gurule was in Officer Flores's "special attention folders," and (5) Gurule was on parole. We disagree that these facts are sufficient to give rise to a "reasonable, articulable suspicion" that Gurule had been, was then, or was "about to be engaged in criminal activity." *Markland*, 2005 UT 26, ¶ 10 (internal quotation marks omitted).

¶ 35 First, the anonymous tip that led the officers to the Allen's grocery store stated only that two Hispanic men were involved in a possible drug deal and that a gray Dodge truck was involved. Because the caller did not describe the physical appearance or dress of the two men, it is presumptive to assume that Gurule was one of the two men involved in the possible drug deal. Officer Flores testified that Allen's was regularly frequented by Hispanic men and Gurule exited the store with shopping bags some time after the gray Dodge truck described by the caller had left the scene. Further, the State has provided absolutely no evidence that the gray Dodge truck described by the caller had any connection to Gurule. The fact that

the truck was registered to a person who was known to be involved in the drug trade has no connection to Gurule or his presence at the store. This leaves us with only Gurule's status as a parolee and the fact that he remained in Officer Flores's "special attention folders." But these facts regarding Gurule's past conduct did not give rise to a reasonable suspicion that Gurule was, at the moment, engaged in or about to be engaged in criminal activity. Rather, they created nothing more than an "unparticularized suspicion or hunch" that Gurule may have a propensity to commit a crime. *Markland*, 2005 UT 26, ¶ 10 (internal quotation marks omitted). Indeed, during oral argument, the State conceded that the officers did not possess reasonable suspicion that Gurule was involved in illegal drug activity based on these factors alone.

¶ 36 The State also argues that the officers' observations during the stop for the traffic infraction gave rise to reasonable suspicion. Specifically, the State argues that Gurule's failure to immediately stop and his suspicious actions, "i.e., driving without full attention to the road and intermittently glancing at one of the officers through his driver's side mirror and down to his left" created reasonable suspicion of illegal activity. But just as we did in *State v. Schlosser*, we conclude that such movements "do not, without more, give rise to reasonable suspicion that criminal conduct had occurred or [is] about to occur." *Id.* at 1138. Because "it is not uncommon for drivers and passengers alike to be nervous and excited and to turn to look at an approaching police officer," *id.*, Gurule's movements in response to the initiation of the traffic stop do not give rise to a reasonable suspicion of drug dealing or other criminal activity.

¶ 37 Finally, even assuming that the officers possessed reasonable suspicion at the initiation of the traffic stop, that suspicion was dispelled by the officers' protective frisk and plain-view search of the vehicle. The officers saw nothing to indicate that Gurule was armed or involved in the possession or distribution of illegal drugs. Therefore, after the completion of the protective frisk and plain-view search, the officers were obliged to return their focus to the original purpose of the traffic stop. But they did not. Instead, they undertook a prolonged investigation into Gurule's possible drug activity.

## IV. THE OFFICERS' SUSTAINED INVESTIGATION INTO POSSIBLE DRUG ACTIVITY DID NOT CONSTITUTE A DE MINIMUS EXCEPTION

¶ 38 In *Arizona v. Johnson*, the U.S. Supreme Court ruled that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." 555 U.S. 323, 333 (2009). In *State v. Simons*, we relied on *Johnson* in holding that an officer's single, unrelated question to the defendant did not present an unconstitutional extension of an otherwise lawful traffic stop. 2013 UT 3, ¶ 39, 296 P.3d 721. But we cautioned "that while some unrelated questioning may be tolerated, officers must remain focused on the original purpose of the stop in the absence of reasonable suspicion justifying an expanded investigation." *Id.* ¶ 38.

¶ 39 Here, the officers' actions "bespoke an utter lack of diligence in pursuing the original purpose of the traffic stop." *Id.* ¶ 33 (internal quotation marks omitted). After the officers completed their protective frisk and plain-view search, they did not return to the original purpose of the stop. Instead, the officers made two calls. They first made a call to request a canine unit to assist in their drug investigation. Second, they called AP&P to describe their observations. Neither of these calls had any relation to Gurule's traffic infraction and they did not constitute a de minimus extension of the stop. Indeed, these calls, and the officers' subsequent search constituted the bulk of Gurule's detention. Because the officers did not possess reasonable suspicion that Gurule was engaged in or about to engage in illegal drug activity, we hold that their search of Gurule's vehicle was unlawful and the evidence obtained as a result should have been suppressed.

## CONCLUSION

¶ 40 The officers were justified in stopping Gurule for a traffic infraction committed in their presence and their safety concerns justified their separation of Gurule from his vehicle and the subsequent protective frisk and plain-view search. But without reasonable suspicion that Gurule was then engaged in any criminal activity, the officers unconstitutionally extended the duration of the stop when they undertook a sustained investigation of possible illegal drug activity. The district court erred in refusing to suppress the evidence seized as a result of that investigation. We accordingly

reverse and remand for further proceedings consistent with this opinion.

¶ 41   Because we conclude that the officers lacked reasonable suspicion that Gurule was engaged in criminal activity, we do not reach the issue of whether AP&P could lawfully delegate to the officers its authority to perform a parole search based on reasonable suspicion.

———————