2025 UT App 82

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHAD HINTZE,
Appellant.

Opinion
No. 20200787-CA
Filed May 30, 2025

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 181903394

David Ferguson, Attorney for Appellant

Simarjit S. Gill, Hyrum J. Hemingway, and Joey L.
Blanch, Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES RYAN M. HARRIS and DAVID N. MORTENSEN concurred.

TENNEY, Judge:

¶1 This case is before this court for a second time. In the first appeal, Chad Hintze challenged the district court's decisions to deny (1) a motion to dismiss on speedy trial grounds and (2) a motion to suppress statements Hintze had made during an encounter with law enforcement. In this court's first opinion, the majority concluded that "the State's delay in prosecuting him had violated his Sixth Amendment right to a speedy trial." *State v. Hintze* (*Hintze I*), 2022 UT App 117, ¶ 2, 520 P.3d 1. The Utah Supreme Court granted review and then reversed that decision. *State v. Hintze* (*Hintze II*), 2025 UT 3, ¶¶ 39–98, 567 P.3d 506. At the close of its opinion, the supreme court "remand[ed] to the court of appeals for further proceedings on Hintze's motion to suppress." *Id.* ¶ 98.

¶2      We note that the suppression issue was fully briefed and capably argued in the original appeal. We further note that, after the case returned to this court on remand, the parties were given the opportunity to point this court to any additional authority relating to the suppression issue that had been issued since *Hintze I*. Neither party alerted this court to any such authority. As set forth below, we now conclude that the district court erred by denying Hintze's motion to suppress, and we therefore reverse that decision and remand the case for further proceedings.

## BACKGROUND[1]

¶3      In 2011, Hintze was convicted of attempted unlawful sexual activity with a minor. *See* Utah Code § 76-4-101 (2008); *id.* § 76-5-401. Because of this conviction, Hintze was required to register as a sex offender. *See id.* § 77-27-21.5(1)(n)(i) (2011).[2] Subject to a few exceptions not at issue in this case, it is accordingly a crime for Hintze to "be in any protected area." *Id.* § 77-27-21.7(2) (2016).[3] By statute, "a community park that is open

---

1. This Background is largely drawn from the majority opinion's Background from *Hintze I*, 2022 UT App 117, 520 P.3d 1.

2. Because of later changes to the statute that required Hintze to register as a sex offender, we cite the version in effect at the time of his 2011 conviction. The current requirements for who qualifies as a sex offender can be found in Utah Code section 77-41-102(19).

3. We cite the version of the statute that was in effect in 2016 when Hintze violated his sex offender registry conditions. Since 2020, the legislature has made minor changes to the numbering and wording of the statute. The statute was then renumbered in 2025 as Utah Code section 53-29-306.

to the public" qualifies as a protected area. *Id.* § 77-27-21.7(1)(a)(iv) (2016).

*The June 2016 Park Incident*

¶4 On June 7, 2016, Hintze and a teenage girl were "eating snacks" and sitting "on [a] park bench" along the Jordan River Trail when three uniformed officers on bike patrol approached them. The officers stopped right in front of Hintze and the teenager and, as discussed in more detail below, parked their bikes in front of and to the side of the bench where Hintze and the teenager were sitting.

¶5 The first officer asked, "[H]ow's it going guys? How old are you guys?" Hintze responded that he was twenty-three years old, and the teenager responded that she was thirteen.[4] The officer then asked how they knew each other. Hintze responded that they were siblings. But the officer doubted this because of "their complexions," so he said to Hintze, "[It] doesn't look like you guys are siblings." In response, Hintze told the officer that he was actually "adopted." When the officer pressed back on that, Hintze then replied that he was actually "kind of adopted into the family" and was "a family friend." At this point (which was about

---

4 . The very early portions of the encounter (including this particular moment) were caught on video but not on audio. When describing this question and answer at the subsequent hearing, the officer testified that Hintze told him that he was twenty-two. But based on the birthdate that Hintze then gave the officer in a portion for which the audio was recorded (which matches Hintze's birthdate as indicated elsewhere in the record), Hintze would have been twenty-three. The difference between twenty-two and twenty-three is immaterial for purposes of the issues on appeal. For consistency, we assume for purposes of our analysis that Hintze was twenty-three at the time of this incident.

a minute into the encounter), the officer asked Hintze for his name and birthdate, which Hintze provided.

¶6     While the first officer and Hintze were engaged in that conversation, the teenager called her mother. The teenager handed the phone to one of the other officers, and he then spoke to the teenager's mother. During that brief conversation, the mother provided the officer with Hintze's name and told him that Hintze was "a family friend." The officer responded by explaining that the officers "just wanted to make sure there wasn't anything else going on" and that they "just wanted to make sure" that the teenager "was safe." The officer then hung up and gave the phone back to the teenager. As the encounter continued, another officer radioed in to dispatch "to check the identity" and run a warrants check on Hintze using the name and birthdate provided by Hintze. From this, the officer learned that Hintze was a registered sex offender.

¶7     The teenager's mother soon came and picked her daughter up, while the officers continued to talk with Hintze. After talking with him for about twenty minutes, the officers decided not to place Hintze under arrest, telling him that they didn't "feel that's the best avenue at this juncture." The officers instead allowed Hintze to walk away.

*Hintze's Motion to Suppress*

¶8     In March 2018, the State charged Hintze with one count of "violation by sex offender of protected area," a class A misdemeanor. *See* Utah Code § 77-27-21.7(2) (2016).

¶9     Hintze later filed a motion to suppress, arguing that he had been seized in violation of the Fourth Amendment "before he gave his name" to the officers. Hintze made two principal arguments in this motion. First, he argued that he had been seized at that point because officers had "pulled up in front of the park

bench," "stood above him," and "launch[ed] into accusatory questioning" about his relationship with the teenager. Hintze argued that if he had "stood up to walk away," "he would have run into one of the three officers." Second, Hintze argued that there was not reasonable suspicion at that point to support a seizure because "[t]here are a host of lawful reasons why a Hispanic adult male might sit on the same park bench as a White underage female." While acknowledging that he gave officers shifting explanations for his relationship with the teenager, Hintze asserted that there was still not a "particularized, articulable suspicion of a crime" because people occasionally "give inconsistent, vague, evasive, or equivocating answers to police questioning," and also because Hintze's ultimate explanation (that he was something of an adopted brother) "is a fairly minimal faux pas" given that he is a "family friend."

¶10 In light of these arguments, Hintze asked the court to suppress the "incriminating evidence" the officers had obtained as well as any "fruit of the poisonous tree." In passing, Hintze suggested that one of the "fruits" of the unconstitutional seizure was the discovery that Hintze "was a registered sex offender."

¶11 The State opposed the motion and, after a hearing, the court denied it. Although the court found that the "officers did ask the individuals their age very quickly," it concluded that the encounter was "a casual encounter up to the point that the name [was] requested." The court further concluded that the encounter was "still a level 1 stop" at the moment the officer asked Hintze for his name, given that the officer had "turn[ed] away from [Hintze], turn[ed] his back to him and [began] dealing with dispatch." This, combined with the "very short" duration of the interaction, Hintze's "casual" actions in continuing to snack and drink as the officers questioned him, and the fact that the officers had not drawn their weapons and had used a "normal" tone of voice, led the court to conclude that "someone in [t]his situation" would not "feel detained." The court further observed that, even

if the encounter could be regarded as "a level 2 stop" at the moment that the officer asked Hintze for his name, it was permitted because the officers had "reasonable articulable suspicion to investigate the relationship between [Hintze] and the young girl." This was so, according to the court, because Hintze had "told the officer three different things regarding their relationship," the apparent age gap between Hintze and the girl, and the testimony showing that officers had "viewed two individuals sitting on a park bench who appeared to be of disparate ages and didn't appear to be related." As a result of its conclusion that Hintze was not unconstitutionally seized, the court did not address Hintze's arguments about the "fruits" of any unconstitutional seizure.

*Hintze's Conditional Guilty Plea and Sentence*

¶12    On September 21, 2020, Hintze entered a conditional guilty plea to the charged offense, reserving the right to appeal the denial of his motion to suppress and the denial of his motion to dismiss the charges based on a speedy trial violation.

¶13    As indicated above, this court initially reversed the denial of Hintze's motion to dismiss, but the supreme court has now reversed that decision. We accordingly now address Hintze's challenge to the denial of his motion to suppress.

ISSUE AND STANDARD OF REVIEW

¶14    "We review a trial court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation as a mixed question of law and fact." *State v. Fuller*, 2014 UT 29, ¶ 17, 332 P.3d 937. "While the court's factual findings are reviewed for clear error, its legal conclusions are reviewed for correctness, including its application of law to the facts of the case." *Id.* The question of whether a particular encounter was consensual or instead constituted a seizure presents a legal

question. *See State v. Perkins*, 2009 UT App 390, ¶ 26, 222 P.3d 1198; *Salt Lake City v. Ray*, 2000 UT App 55, ¶ 8, 998 P.2d 274.

ANALYSIS

¶15   The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. To determine whether there was an unreasonable search or seizure, courts must first determine the nature of the police-citizen encounter at issue. There are three types:

> A level one encounter occurs when a police officer approaches a citizen and asks questions, but the person is not detained against his will and remains free to leave. A level two encounter occurs when a police officer temporarily seizes an individual because the officer has a reasonable, articulable suspicion that the person has committed or is about to commit a crime. Finally, a level three stop occurs when a police officer has probable cause to believe that a crime has been committed and effects an arrest of the suspect.

*State v. Mitchell*, 2019 UT App 190, ¶ 12, 455 P.3d 103 (quotation simplified).

¶16   As noted, Hintze's motion was targeted at the moment when the first officer asked him for his name. This was the moment of demarcation because, again, once officers learned Hintze's name, they had a basis for discovering that Hintze was a sex offender and not legally permitted to be at the park. Given this, the question is what kind of encounter was underway when the officers asked Hintze for his name. The district court ruled below, and the State contends on appeal, that it was a consensual level one encounter. Hintze, however, argues that it was a level two encounter that already amounted to a seizure. And if it was a

level two encounter by that point, we must then determine whether that seizure was justified by reasonable suspicion.

¶17    As set forth in Part A, we conclude that Hintze had already been seized when the officer asked him for his name. As set forth in Part B, we conclude that this seizure was not supported by reasonable suspicion.

A.    Seizure

¶18    A Fourth Amendment seizure occurs when an officer "by means of physical force or show of authority, terminates or restrains" a person's "freedom of movement." *State v. Anderson*, 2015 UT 90, ¶ 10, 362 P.3d 1232 (quotation simplified). "A show of authority is sufficient to constitute a seizure if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (quotation simplified). "Thus it is a hypothetical reasonable person's interpretation of an officer's actions—not the officer's intent—that determines whether an individual has been seized by an officer through a show of authority." *Id.* Although this is a circumstance-dependent inquiry, it is still "helpful" to examine past cases in which courts addressed these issues and then "compar[e]" those cases "to our facts." *State v. Bean*, 869 P.2d 984, 986 (Utah Ct. App. 1994).

¶19    In our view, there are several circumstances that are of particular importance to the resolution of this case.

¶20    **First, the presence of multiple armed and uniformed police officers.** When determining whether "a reasonable person would have believed that he was not free to leave," courts commonly look to whether there was a "threatening presence of several officers." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In assessing this, courts look to such things as the number

of officers, the officer-to-citizen ratio, whether the officers were uniformed, and whether the officers were armed.

¶21    In one case, for example, we concluded that "the presence of four armed and uniformed officers constituted a show of authority," particularly because the officers "outnumber[ed] [the suspects] two-to-one." *State v. Bui-Cornethan*, 2021 UT App 56, ¶ 22, 490 P.3d 191. In another case, we held that a suspect was seized, in part, because he "was confronted with two uniformed officers," each of whom was equipped "with badge, gun, the whole works." *Salt Lake City v. Ray*, 2000 UT App 55, ¶ 13, 998 P.2d 274 (quotation simplified). By contrast, we reached a different conclusion when "only two officers" questioned "five males." *State v. Merworth*, 2006 UT App 489, ¶ 9, 153 P.3d 775. And we also held that there was no seizure in a case where "only one officer" questioned a single suspect and, although the officer was armed, he "used no show of force such as drawing his weapon or flashing his police lights." *State v. Adams*, 2007 UT App 117, ¶ 14, 158 P.3d 1134.

¶22    In this case, three officers approached two citizens, so the officers outnumbered the citizens. Moreover, all three officers were uniformed, and as the district court put it, "[t]hey certainly had weapons[, although] none of them [were] drawn." While not dispositive, these circumstances support the conclusion that this encounter constituted a seizure.

¶23    **Second, the positioning of the officers' bikes.** An "officer's positioning of [his or] her vehicle is certainly a factor that" can weigh "in favor of finding under a totality of the circumstances that [a] defendant was seized." *State v. Struhs*, 940 P.2d 1225, 1228 (Utah Ct. App. 1997). Such positioning is particularly relevant if the officer uses his or her vehicle to block a citizen's path, because this would naturally be seen as infringing on the citizen's "freedom of movement." *Id.* at 1227; *see also State v. Smith*, 2022 UT 13, ¶¶ 3, 26, 513 P.3d 629 (concluding that

officers seized a defendant when they "parked in a manner intended to prevent [the defendant's] vehicle from exiting and to allow the officers to shine a spotlight directly into the vehicle" (quotation simplified)); *State v. Smith*, 781 P.2d 879, 882 (Utah Ct. App. 1989) (concluding that the defendant's "liberty was restrained and a seizure occurred," in part, because the officer "blocked [the] defendant's car" with his own).

¶24 By contrast, we've held that the positioning of an officer's vehicle did not suggest that there was a seizure when the officer "parked in front of [a defendant's] vehicle at a forty-five degree angle," "did not block the vehicle in," and left room so that it was "possible for [the defendant] to drive away." *State v. Merlen*, 2002 UT App 181U, para. 2. Other courts have similarly concluded that there wasn't a seizure in situations in which officers did not effectively block the citizen in. *See, e.g.*, *United States v. Tafuna*, 5 F.4th 1197, 1201 (10th Cir. 2021) (considering it important that although the officer's "police vehicle was parked at an angle so that it faced the driver's side of the car, it did not obstruct the car's path of exit or otherwise impede" the driver's movement); *cf. State v. Rigby*, 2016 UT App 42, ¶ 21, 369 P.3d 127 (acknowledging "Utah's historical pattern of tracking federal law in [the Fourth Amendment] area both in principle and in practice").

¶25 Here, the officers were on bikes, not in cars. But the same analysis would apply, particularly where, as here, the citizens were on foot as opposed to being in cars (or bikes) of their own. *See, e.g.*, *People v. Taylor*, 2018 CO 35, ¶ 12, 415 P.3d 821 (explaining that an officer on bike patrol who stopped his bike and left "room on that portion of the sidewalk for [the defendant] to keep walking" did not seize the defendant). So, as with a car case, the question is whether the officers' vehicles (i.e., their bikes) were positioned such that they would restrain Hintze's freedom of movement.

¶26    They were. The body camera footage from the lead officer was introduced below and is in the record. This video shows that the three officers pedaled up to the bench where Hintze and the teenager were sitting. The bench was on a concrete patch that was alongside a paved path, there was a fence behind the bench (at something of an angle), and there was a busy road intersecting the path. To either side of the bench was overgrown grass. The officer who questioned Hintze was at the right of this group of officers, and he stopped on the path just a few feet in front of Hintze. This officer got off his bike and parked his bike to his right, near the end of the bench on the side where Hintze was sitting. This officer and his bike would have been in the way if Hintze had tried walking away on the path in that direction. A second officer was positioned in the middle of the trio. He parked his bike immediately in front of Hintze, positioning his bike mere inches from Hintze's knee. That second officer and a third officer who was behind him were positioned on the portion of pavement to the left of Hintze and the path in that direction, thereby blocking Hintze in that direction as well. Thus, from the very outset of this encounter, Hintze was effectively surrounded, and a reasonable person would have believed that he did not have "freedom of movement." *Struhs*, 940 P.2d at 1227.

¶27    The State nevertheless contends that a person in this position would have felt free to leave anyway. The State bases this assertion on *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210 (1984), and *United States v. Drayton*, 536 U.S. 194 (2002). Relying on those cases, the State argues that government agents can "directly question[] individuals about potential criminal or quasi-criminal" activities "while other government agents [stand] by the exits" without effectuating a seizure. Unlike the State, however, we conclude that *Delgado* and *Drayton* are distinguishable from this case in two key ways.

¶28    First, *Delgado* and *Drayton* both involved police-citizen encounters in spaces where the individuals had already

submitted themselves to some degree of confinement before encountering the officers. In *Delgado,* for instance, government agents interviewed factory workers inside several factories. 466 U.S. at 212. When assessing whether agents had done anything to restrict the workers' freedom of movement, the Supreme Court thought it significant that "when people are at work[,] their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *Id.* at 218. The Court accordingly concluded that the agents' questioning did not "prevent" the workers "from moving about the factories" because it did not limit the workers' freedom of movement more than their own employment already had. *Id.*

¶29    *Drayton* involved a different setting but a similar dynamic. There, police officers approached and questioned individuals on board a bus. 536 U.S. at 197–98. Reviewing a Fourth Amendment challenge to the questioning, the Court thought it significant that the passengers had already restricted their own movement by choosing to enter and then stay on the bus. *Id.* at 201–02. Relying on *Florida v. Bostick*, 501 U.S. 429 (1991), the Court reinforced the notion that "the traditional rule, which states that a seizure does not occur so long as a reasonable person would feel free to disregard the police and go about his business, is not an accurate measure of the coercive effect of a bus encounter" because a "bus rider's movements are" already "confined" by the rider's decision to get on the bus. *Drayton*, 536 U.S. at 201 (quotation simplified); *see also Bostick*, 501 U.S. at 435–36 (explaining that "the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter" when "the person is seated on a bus and has no desire to leave"). Thus, although individuals' "movements [are] 'confined' in a sense" while they sit on a bus, this restriction is "the natural result of [the bus rider's] decision to take the bus," which is a "factor independent of police conduct." *Bostick*, 501 U.S. at 436.

¶30     Unlike *Delgado*'s workers or *Drayton*'s passengers, Hintze did not encounter officers in a place in which he had already voluntarily restricted his own movement. Rather, at the time of this encounter, he was sitting on a park bench on an open and public path. Until officers arrived and positioned themselves between Hintze and the path, Hintze would have been entirely free to get up and leave. These cases are therefore distinguishable on that basis alone.

¶31     Second, in *Delgado*, the government "placed agents *near* the exits of the factory sites" and "*near* the factory doors." 466 U.S. at 218 (emphases added). The Supreme Court took note of this precise positioning, explaining that the "presence of agents *by* the exits posed no reasonable threat of detention to these workers while they walked throughout the factories on job assignments." *Id.* at 219 (emphasis added). The positioning in *Drayton* was similar. There, one officer was near the front of the bus; but even so, the Court thought his presence there was non-coercive because, by kneeling on the driver's seat and facing the rear of the bus, he was not "blocking the aisle or otherwise obstructing the bus exit." *Drayton*, 536 U.S. at 198. The same was true for his partner, who approached passengers while standing "next to or just behind each passenger with whom he spoke" to "*avoid blocking the aisle*." *Id.* (emphasis added).

¶32     This stands in contrast to what happened here. Again, the three officers positioned themselves and their bikes in between Hintze and the path by which he would conceivably leave. If he tried walking away from the encounter, Hintze would have had to brush by these uniformed officers or their bikes. We're hard pressed to imagine that a reasonable person would feel comfortable doing so in an attempt to terminate an encounter, particularly while the officers were in the act of asking him questions, and we're likewise hard pressed to imagine that police officers would ever regard this as acceptable behavior. This is therefore strongly suggestive that a seizure occurred.

¶33    **Third, the nature of the questioning.** An officer can "approach[] a citizen and ask[] questions" without moving beyond a level one encounter. *Mitchell*, 2019 UT App 190, ¶ 12 (quotation simplified). In this sense, officers do not seize a person by "merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions," or "by putting questions to him if the person is willing to listen." *Bostick*, 501 U.S. at 434 (quotation simplified).

¶34    But even so, the "manner of questioning, the content of the questions, and the context in which the questions are being asked can convert mere questioning into a level two seizure if, under all of the circumstances, a reasonable person would not feel free to leave." *State v. Alverez*, 2006 UT 61, ¶ 12, 147 P.3d 425 (quotation simplified). With respect to the manner of questioning, "the use of language or tone of voice indicating that compliance with the officer's request might be compelled" can suggest that the conversation is coercive. *Mendenhall*, 446 U.S. at 554. And with respect to the content of the questions, questions that are "accusatory in nature" are suggestive that a detention is underway. *Alverez*, 2006 UT 61, ¶ 12.

¶35    Here, the district court found that the officers' "tone of voice was normal," and Hintze hasn't challenged that finding on appeal. But even so, we regard the content of the questioning as having been at least somewhat accusatory in nature from essentially the start of the encounter. The officers did not approach Hintze and begin by casually "asking him if he [was] willing to answer some questions" or anything similar. *Bostick*, 501 U.S. at 434 (quotation simplified). Rather, as the officers approached, the first officer asked, "[H]ow's it going guys? How old are you guys?" As noted by the district court, this question about the ages of Hintze and the teenager came "very quickly." After Hintze and the teenager responded, the first officer then asked Hintze about his relationship to the teenager. When Hintze said that they were siblings, the officer told Hintze that he thought

Hintze didn't "look like" the teenager's sibling. The officer then immediately asked Hintze several follow-up questions about the nature of his relationship to the teenager, and Hintze's shifting answers were in response to those questions.

¶36    As discussed below, it's true that a person's shifting story can contribute to a determination that reasonable suspicion existed. But the initial issue here is whether Hintze had already been seized. And on that front, it matters that these officers didn't casually approach Hintze and ask him if he was willing to answer questions; rather, when they approached Hintze, the lead officer *started* by asking questions about his age and relationship to the teenager (questions that by their nature already suggested some degree of suspicion by the officer), and when Hintze answered the first question about his relationship to the teenager, the officer responded by openly questioning the truthfulness of Hintze's answer. At that moment, the questioning had become accusatory. Because Hintze was now being asked accusatory questions, this, too, suggested that he was no longer "free to disregard the questions, get [off the bench], and [walk] away." *Alverez*, 2006 UT 61, ¶ 12.

\* \* \* \* \*

¶37    This all leads back to the questions of whether a seizure occurred and, if so, when. And again, when assessing this, we must consider the totality of the circumstances. So to recap, two citizens were approached by three uniformed officers, the officers were armed, and the officers almost immediately positioned themselves and their bikes between Hintze and the path that he would take if he tried to leave. After the lead officer asked about Hintze's relationship to the teenager, the officer asked follow-up questions that suggested that he thought Hintze was not telling him the truth. All of this occurred before the officer asked Hintze for his name, which is the question that led to the incriminating information about Hintze's sex offender status (and park

visitation restrictions), and which is accordingly the information at issue in Hintze's motion to suppress.

¶38 Under these circumstances, we don't believe that a reasonable person in Hintze's position would have felt free to stand up, brush by the officers, ignore the pending accusatory questions, and terminate the encounter. Because of this, we agree with Hintze that he had been seized at the moment that he gave his name to the officers.

B.     Reasonable Suspicion

¶39 "Having determined that a level two Fourth Amendment seizure did occur in this case," we now "turn to whether the officers had a reasonable and articulable suspicion of criminal activity in order to justify [the] detention." *Alverez*, 2006 UT 61, ¶ 13. "Reasonable suspicion requires an objectively reasonable belief that an individual is engaged in or is about to be engaged in criminal activity." *State v. Gurule*, 2013 UT 58, ¶ 32, 321 P.3d 1039 (quotation simplified). While "officers need not rule out the possibility of innocent conduct, and the likelihood of criminal activity need not rise to the level required for probable cause, reasonable suspicion must be supported by specific and articulable facts and rational inferences," and it "cannot be merely an inchoate and unparticularized suspicion or hunch." *Id.* (quotation simplified). When conducting this analysis, we "look to the totality of the circumstances to determine whether, taken together, the facts warranted further investigation by the police officer[s]." *Alverez*, 2006 UT 61, ¶ 14 (quotation simplified).

¶40 "Here, the parties do not contest the objective facts apparent to" the officers "or the order in which they occurred." *State v. Simons*, 2013 UT 3, ¶ 23, 296 P.3d 721. We believe that the potentially relevant circumstances here are these:

- Officers saw Hintze and a teenage girl sitting on a park bench together.

- Hintze and the teenager had different complexions.[5]

- Officers approached the two, asked them their ages, and asked them about their relationship.

- In response to the question about their ages, officers learned that Hintze was twenty-three and the teenager was thirteen.

- After Hintze gave an initial response to the question about their relationship, the questioning officer suggested that he thought Hintze was not telling the truth.

- In response to further questioning, Hintze gave shifting answers about his relationship to the teenager.

- Moments later, the officer asked Hintze for his name.

The question, then, is whether the circumstances prior to Hintze being seized supported a reasonable suspicion that criminal activity was underway, thereby justifying the investigatory detention.

¶41    It's true that Hintze and the teenager were of different ages and complexions and were sitting together on a park bench. But to support a seizure—i.e., to give officers the authority to restrain their movement—there must have been a reasonable suspicion that "criminal activity [was] afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Here, when officers saw the pair, they weren't holding hands or kissing; in fact, they weren't even touching each other.

---

5. The officer seemed to think that the difference in complexions mattered because it might suggest that the two were not biologically related.

They also weren't hiding or sitting in a secluded place. Rather, they were eating snacks on a public park bench in the middle of the day. Moreover, they didn't "attempt to leave the area when the police approached." *State v. Goddard*, 2021 UT App 124, ¶ 27, 501 P.3d 1188; *cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (explaining that an individual's "unprovoked flight" or "evasive behavior" can be "pertinent" "in determining reasonable suspicion"). Instead, as officers approached, the two remained seated on the bench, apparently unconcerned. So without something more, we don't believe that there would be a reasonable basis at that point for suspecting that something criminal was afoot.

¶42 The *something more* that the State points to is the fact that Hintze then gave shifting answers to the lead officer's questions about the nature of his relationship with the teenager. We recognize that a person's shifting answers to questions from an officer can contribute to reasonable suspicion. *See State v. Duhaime*, 2011 UT App 209, ¶ 15, 258 P.3d 649 (recognizing that "vague, inconsistent or evasive answers" can support reasonable suspicion (quotation simplified)); *see also State v. Little*, 2012 UT App 168, ¶ 5, 280 P.3d 1072 (noting that "the officers developed additional reasonable suspicion upon hearing the inconsistent stories told by" the defendant and his mother).

¶43 But even so, we conclude that Hintze had already been seized before he started giving those shifting answers. Again, three uniformed officers approached Hintze and positioned themselves and their bikes around him, and they placed themselves directly between Hintze and the path by which he would conceivably leave. This was likely enough by itself to constitute a seizure. But even if it wasn't, we conclude that Hintze was seized when the first officer started the conversation by almost immediately asking accusatory questions and then questioning Hintze's initial answers.

¶44 Thus, even before Hintze's story had started to meaningfully shift, the officers had already blocked his movement and communicated to him that he was suspected of wrongdoing. At that moment, a reasonable person would not have felt free to leave. But at that moment, there also wasn't yet a reasonable basis for suspecting that Hintze was engaged in or about to engage in criminal conduct.

¶45 We therefore conclude that at the moment the officers asked Hintze for his name, Hintze had been seized in violation of the Fourth Amendment. Because of this, we conclude that the district court erred in denying Hintze's motion to suppress the statements that Hintze made to officers in response to those questions.[6]

---

6. In his motion to suppress, Hintze asked the court to suppress the "incriminating information" that officers obtained from the unconstitutional seizure, and as discussed, the focus of the briefing (both below and on appeal) has been on Hintze's response to the question about his name. This is why we've concluded that that response should have been suppressed.

We note, however, that Hintze also asked the court to suppress any "fruit of the poisonous tree"—i.e., evidence that officers learned about as a result of that unconstitutional seizure. And in passing, Hintze suggested that this included the fact that Hintze "was a registered sex offender." But because the district court concluded that Hintze was not unconstitutionally seized, it never ruled on whether any other evidence was unconstitutionally obtained as a result of that seizure (and, if so, what it was), nor did the court rule on whether officers would have obtained any such evidence through some other means. The parties also have not given this issue any attention in the appellate briefing. As a result, we have no occasion to weigh in on those issues in the first instance. On remand, the district court should

(continued…)

CONCLUSION

¶46     For the foregoing reasons, we reverse the denial of Hintze's motion to suppress, and we remand the case for further proceedings consistent with this opinion.

―――――――

determine what, if any, additional evidence should be suppressed as a result of the seizure that had occurred at the moment that the officer asked for Hintze's name.